EXHIBIT A

# COMMONWEALTH OF VIRGINIA



MAKE RETURN ON
THIS COPY

ALBEMARLE CIRCUIT COURT
Civil Division
501 E. JEFFERSON ST.
CHARLOTTESVILLE VA 22902
(434) 972-4086

Proof of Service

Virginia:
In the ALBEMARLE CIRCUIT COURT

Case number: 003CL21001492-00
Service number: 001
Service filed: October 22, 2021
Judge:

Served by: SPECIAL PROCESS SERVER
Style of case: JOHN DOE  vs UNIVERSITY OF VIRGINIA
Service on: UNIVERSITY OF VIRGINIA
(PRIVATE PROCESS SERVER)
400 EMMET STREET, S
CHARLOTTESVILLE VA 22903

Attorney: BINNALL, JESSE R
717 KING ST.
SUITE 200
ALEXANDRIA VA 22314

Instructions:

Returns shall be made hereon, showing service of Summons issued Monday, October 25, 2021 with a copy of the
Complaint filed Friday, October 22, 2021 attached.

Hearing date  :
Service issued: Monday, October 25, 2021

For Sheriff Use Only

RECEIVED

OCT - 6 2022

University of Virginia
Board of Visitors Office

EXHIBIT A

# COMMONWEALTH OF VIRGINIA



ALBEMARLE CIRCUIT COURT
Civil Division
501 E. JEFFERSON ST.
CHARLOTTESVILLE VA 22902
(434) 972-4086

Summons

To: UNIVERSITY OF VIRGINIA          Case No. 003CL21001492-00
(PRIVATE PROCESS SERVER)
400 EMMET STREET, S
CHARLOTTESVILLE VA 22903

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Monday, October 25, 2021

Clerk of Court: JON R ZUG

by _____
                              (CLERK/DEPUTY CLERK )

Instructions:

Hearing Official:

Attorney's name:     BINNALL, JESSE R
                     717 KING ST.
                     SUITE 200
                     ALEXANDRIA VA 22314

# COVER SHEET FOR FILING CIVIL ACTIONS
COMMONWEALTH OF VIRGINIA

Albemarle County

FILED IN THE CLERK'S OFFICE
OF THE CIRCUIT COURT OF THE
ALBEMARLE CIRCUIT COURT
Case No. .......................... Circuit Court
DATE: 10/22/2021 16:17:18

John Doe .......................... v./In re:

PLAINTIFF(S)

University of Virginia

See Attachment for Defendants

DEFENDANT(S)

TESE ..........................
CLERK/DEPUTY CLERK

I, the undersigned [ ] plaintiff [ ] defendant [X] attorney for [X] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

## GENERAL CIVIL

**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Counterclaim
  [ ] Monetary Damages
  [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court

**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[ ] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment

**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
  [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights

**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[X] Other General Tort Liability

## ADMINISTRATIVE LAW
[ ] Appeal/Judicial Review of Decision of (select one)
  [ ] ABC Board
  [ ] Board of Zoning
  [ ] Compensation Board
  [ ] DMV License Suspension
  [ ] Employee Grievance Decision
  [ ] Employment Commission
  [ ] Local Government
  [ ] Marine Resources Commission
  [ ] School Board
  [ ] Voter Registration
  [ ] Other Administrative Appeal

## DOMESTIC/FAMILY
[ ] Adoption
  [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
  [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
  [ ] Complaint – Contested*
  [ ] Complaint – Uncontested*
  [ ] Counterclaim/Responsive Pleading
  [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
  [ ] Separate Maintenance Counterclaim

## WRITS
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

## PROBATE/WILLS AND TRUSTS
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
  [ ] Guardian/Conservator
  [ ] Standby Guardian/Conservator
  [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
  [ ] Impress/Declare/Create
  [ ] Reformation
[ ] Will (select one)
  [ ] Construe
  [ ] Contested

## MISCELLANEOUS
[ ] Amend Death Certificate
[ ] Appointment (select one)
  [ ] Church Trustee
  [ ] Conservator of Peace
  [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
  [ ] Reinstatement pursuant to § 46.2-427
  [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
  [ ] Correct Erroneous State/Local
  [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify) ..........................

[X] Damages in the amount of $ 5,000,000.00 .......................... are claimed.

10/22/2021
DATE

[ ] PLAINTIFF  [ ] DEFENDANT  [X] ATTORNEY FOR  [X] PLAINTIFF  [ ] DEFENDANT

Jesse R. Binnall
PRINT NAME

Binnall Law Group, PLLC
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

717 King St., Suite 200, Alexandria, VA 22314

jesse@binnall.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

## Civil Action Type Codes
### (Clerk's Office Use Only)

Accounting ................................................ ACCT
Adoption ................................................... ADOP
Adoption – Foreign .................................... FORA
Adult Protection ........................................ PROT
Aid and Guidance ........................................ AID
Amend Death Certificate ............................ ADC
Annexation ............................................... ANEX
Annulment ................................................ ANUL
Annulment – Counterclaim/Responsive Pleading... ACRP
Appeal/Judicial Review
   ABC Board ................................................ ABC
   Board of Zoning ...................................... ZONE
   Compensation Board ............................... ACOM
   DMV License Suspension .............................. JR
   Employment Commission ........................... EMP
   Employment Grievance Decision ............... GRV
   Local Government ................................... GOVT
   Marine Resources .................................... MAR
   School Board .............................................. JR
   Voter Registration ................................. AVOT
   Other Administrative Appeal .................... AAPL
Appointment
   Conservator of Peace ................................ COP
   Church Trustee ...................................... AOCT
   Custodian/Successor Custodian (UTMA) ...... UTMA
   Guardian/Conservator ............................. APPT
   Marriage Celebrant ................................ ROMC
   Standby Guardian/Conservator ................ STND
Approval of Transfer of Structured Settlement ............. SS
Asbestos Litigation ....................................... AL
Attachment ................................................ ATT
Bond Forfeiture Appeal ............................... BFA
Child Abuse and Neglect – Unfounded Complaint .. CAN
Civil Contempt .......................................... CCON
Claim Impleading Third Party Defendant –
   Monetary Damages/No Monetary Damages .......... CTP
Complaint – (Miscellaneous) ....................... COM
Compromise Settlement ............................ COMP
Condemnation .......................................... COND
Confessed Judgment ..................................... CJ
Contract Action ........................................ CNTR
Contract Specific Performance ................... PERF
Counterclaim – Monetary Damages/No Monetary
   Damages .................................................. CC
Cross Claim ............................................. CROS
Declaratory Judgment ............................... DECL
Declare Death .......................................... DDTH
Detinue ...................................................... DET
Divorce
   Complaint – Contested/Uncontested .......... DIV
   Counterclaim/Responsive Pleading .......... DCRP
   Reinstatement – Custody/Visitation/Support/
     Equitable Distribution ......................... CVS
Driving Privileges
   Reinstatement pursuant to § 46.2-427 ......... DRIV
   Restoration – Habitual Offender or
   3rd Offense .......................................... REST

Ejectment ................................................ EJET
Encumber/Sell Real Estate ........................... RE
Enforce Vendor's Lien .............................. VEND
Escheatment ............................................. ESC
Establish Boundaries ................................ ESTB
Expungement .......................................... XPUN
Forfeiture of Property or Money ............... FORF
Freedom of Information .............................. FOI
Garnishment ........................................... GARN
Injunction ................................................. INJ
Intentional Tort ....................................... ITOR
Interdiction ............................................. INTD
Interpleader ............................................ INTP
Interrogatory .......................................... INTR
Judgment Lien – Bill to Enforce ................ LIEN
Landlord/Tenant ......................................... LT
Law Enforcement/Public Official Petition ............. LEP
Mechanics Lien ....................................... MECH
Medical Malpractice ................................. MED
Motor Vehicle Tort ..................................... MV
Name Change ............................................. NC
Other General Tort Liability .................... GTOR
Partition ................................................. PART
Permit, Unconstitutional Grant/Denial by Locality LUC
Petition – (Miscellaneous) .......................... PET
Product Liability ...................................... PROD
Quiet Title ................................................. QT
Referendum Elections ............................... ELEC
Reinstatement (Other than divorce or driving
   privileges) ............................................ REIN
Removal of Case to Federal Court ............... REM
Restore Firearms Rights – Felony ............. RFRF
Restore Firearms Rights – Review ............. RFRR
Separate Maintenance ................................ SEP
Separate Maintenance – Counterclaim/Responsive
   Pleading .............................................. SCRP
Sever Order ............................................. SEVR
Taxes
   Correct Erroneous State/Local ................. CTAX
   Delinquent ............................................ DTAX
Termination of Mineral Rights ..................... MIN
Trust – Impress/Declare/Create ................. TRST
Trust – Reformation .................................. REFT
Uniform Foreign Country Money Judgments ...... RFCJ
Unlawful Detainer ....................................... UD
Vehicle Confiscation .................................. VEH
Voting Rights – Restoration ...................... VOTE
Will Construction ..................................... CNST
Will Contested ........................................ WILL
Writs
   Certiorari ................................................ WC
   Habeas Corpus ........................................ WHC
   Mandamus ............................................... WM
   Prohibition .............................................. WP
   Quo Warranto ........................................ WQW
Wrongful Death ......................................... WD

FORM CC-1416 (MASTER) PAGE TWO 07/16

Circuit Court for Albemarle County
*John Doe v. University of Virginia, et al.,*
**Attachment – List of Defendants**

UNIVERSITY OF VIRGINIA,
400 Emmett St S
Charlottesville, VA 22903

CHRISTINE WECHSLER, *In her individual capacity*
925 Harvest Drive
Suite 300
Blue Bell, PA 19422

EMILY BABB, *In her individual capacity*
Driscoll Center South
2050 E. Evans Ave.
Denver, CO 80210

REBECCA LOCKE LEONARD, *In her individual capacity*
400 Emmett St S
Charlottesville, VA 22903

RAJIVA SENEVIRATNE, *In his individual capacity*
417 Emmet Street S
PO Box 400260
Charlottesville, VA 22904

DIANE WHALEY, *In her individual capacity*
Bavaro Hall 234B
PO Box 400265
Charlottesville, VA 22904

JAMES E. RYAN, *In his official capacity* as President of the University of Virginia
Madison Hall
P.O. Box 400224
University of Virginia
Charlottesville, VA 22904

**VIRGINIA:**

FILED IN THE CLERK'S OFFICE
OF THE CIRCUIT COURT OF THE
ALBEMARLE CIRCUIT COURT
DATE: 10/22/2021 @16:17:34
JON ZUG ,CLERK

TESTE: _____
CLERK/DEPUTY CLERK

## IN THE CIRCUIT COURT FOR ALBEMARLE COUNTY

**JOHN DOE,**[1]

    **Plaintiff,**

**v.**

    Case No. CL21-1492

**UNIVERSITY OF VIRGINIA,**
400 Emmett St S
Charlottesville, VA 22903

**CHRISTINE WECHSLER,**
925 Harvest Drive
Suite 300
Blue Bell, PA 19422
*In her individual capacity*

**JURY TRIAL DEMANDED**

**EMILY BABB,**
Driscoll Center South
2050 E. Evans Ave.
Denver, CO 80210
*In her individual capacity*

**REBECCA LOCKE LEONARD,**
400 Emmett St S
Charlottesville, VA 22903
*In her individual capacity*

**RAJIVA SENEVIRATNE,**
417 Emmet Street S
PO Box 400260
Charlottesville, VA 22904
*In his individual capacity*

---

[1] Due to the sensitive nature of the allegations herein, John Doe proceeds pseudonymously pursuant to Va. Code § 8.01-15.1. His identity is known to all Defendants. If this Court deems it necessary, Doe will move this Court for an order "concerning the propriety of anonymous participation." Va. Code §8.01-15.1(A).

1

DIANE WHALEY,
Bavaro Hall 234B
PO Box 400265
Charlottesville, VA 22904
*In her individual capacity*

JAMES E. RYAN
Madison Hall
P.O. Box 400224
University of Virginia
Charlottesville, VA 22904
*In his official capacity*

Defendants.

## COMPLAINT

John Doe was a student at the University of Virginia that was falsely and maliciously accused of sexual assault by a female student. Using a process violative of constitutional due process and riddled with bias on the basis of sex, the University and its agents erroneously found Doe "responsible" for this false accusation. As such, John Doe brings this Complaint against Defendants, and states as follows:

1.     This is a civil action against Defendants for violations of Title IX (20 U.S.C. §§ 1681 *et seq.*), violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, breach of contract, and tortious interference with contractual relations.

## PARTIES

2.     John Doe was, at all times relevant to the allegations, an undergraduate student at the University of Virginia. He is domiciled in Florida.

3.     The University of Virginia (the "University") is a state government

entity and is located in Albemarle County, Virginia.

4.      Christine Wechsler is an attorney and was, at all times relevant to the allegations, the investigator retained by the University to conduct its investigation into John Doe. Upon information and belief, she is domiciled in Pennsylvania.

5.      Emily Babb is an attorney and was, at all times relevant to the allegations, the Title IX Coordinator at the University, responsible for the University's compliance with Title IX and the United States Constitution. Upon information and belief, she is now domiciled in Colorado.

6.      Rebecca Locke Leonard was a member of the University Review Panel that affirmed the findings against Doe. She is an employee of the University and is domiciled in Virginia.

7.      Rajiva Seneviratne was a member of the University Review Panel that affirmed the findings against Doe. He is an employee of the University and is domiciled in Virginia.

8.      Diane Whaley was a member of the University Review Panel that affirmed the findings against Doe. She is an employee of the University and is domiciled in Virginia.

9.      James E. Ryan is an attorney and is the President of the University with ultimate authority over its operations, including its resolution of sexual assault complaints filed by students.

## Jurisdiction and Venue

10.     Subject matter jurisdiction is proper in the Commonwealth of Virginia and the Circuit Court of Albemarle County because the amount in controversy exceeds $25,000.

11.     This Court possesses personal jurisdiction over the University because it is a Virginia government entity, and over the individual Defendants domiciled in Virginia by virtue of their domicile. Personal jurisdiction is proper over out-of-state Defendants because they transacted business in Virginia, contracted to supply services or things in Virginia, or caused tortious injury in Virginia. Va. Code § 8.01-328.1(A).

12.     Venue is proper in this Court because all causes of action arose in Albemarle County, Virginia. Va. Code § 8.01-262.

## University's Background

13.     Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX. Title IX is a federal statute prohibiting discrimination on the basis of sex in educational institutions that receive federal funding. 20 U.S.C. § 1681.

14.     Should the University fail to adequately remedy sexual harassment on campus, it could face litigation from alleged victims of sexual assault. These plaintiffs tend to be female.

15.     In April 2011, the pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This

guidance, despite not having undergone the formal rulemaking process, demanded universities receiving federal funding weaken procedural protections for accused students, including limiting the right to a hearing for students accused of sexual harassment and lowering the burden of proof to preponderance of the evidence. The Dear Colleague Letter and later-issued guidance had publicized statistics of a supposed "rape epidemic" on college campuses targeting female students. These statistics are demonstrably false and debunked.

16.     The Dear Colleague Letter incentivized universities receiving federal funding, including Defendant University, to find male accused students responsible regardless of the weight of the evidence against them. If the Department of Education saw the University as insufficiently protective of alleged female sexual harassment victims, the Department of Education could withdraw federal funding from the University.

17.     Defendant University receives federal funding. Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

18.     Increasing the pressure on the University even further, the Department of Education opened an investigation into the University and its handling of female students' sexual misconduct complaints. On September 21, 2015, the Department of Education issued a "findings letter" that the University had violated Title IX by, among other things, insufficiently addressing complaints of sexual assault and harassment by female students, and indicated the University entered into a

Resolution Agreement with the Department. The letter exclusively addressed complaints by female students (with the exception of one male student complaint filed in tandem with female student complaints against a professor) and encouraged the University to expel students accused of sexual assault by harshly criticizing the University's decisions not to expel accused students. The letter notified the University that the Department would monitor the University to test its compliance and would initiate enforcement proceedings if it did not comply.

19.    Therefore, the University and its employees had an incentive to find John Doe responsible and expel him, as a male accused student, regardless of the weight of evidence against him. This, in turn, provided the University and its employees with incentive to limit any chance John Doe had at defending himself by removing procedural due process protections, and to infect the investigation and adjudication with bias against him on the basis of sex.

20.    The Dear Colleague Letter was rescinded in 2017. The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus, including the Resolution Agreement.

### John Doe, Jacob Doe, and Jane Roe[2]

21.    After excelling academically in high school, John Doe enrolled in the

---

[2] Jacob Doe and Jane Roe are not these students' real names. Due to the sensitive nature of these allegations, their true identities are omitted. All Defendants know their true identities.

University in the Fall 2017 semester. At all times during his enrollment at the University, he was a successful computer engineering major on track to graduate in the Spring 2020 semester.

22.     Jacob Doe, at all times relevant to the allegations, was a student at James Madison University (JMU). Jacob Doe and John Doe were friends before they began college and remained in touch throughout John Doe's time at the University.

23.     Jane Roe was a female student at the University at all times relevant to the allegations. John Doe and Jane Roe knew each other throughout their time at the University.

### The Incident

24.     On or about February 8, 2019, Jacob Doe came to visit John Doe, and the two friends went out drinking.

25.     John Doe and Jacob Doe then made their way to various student parties on or around the University campus. Upon leaving the last party, at approximately 1:40 a.m., the two friends ran into another group of students. This group of students included Jane Roe and two other students. At that time, Jane Roe did not appear intoxicated.

26.     The two groups of friends merged, and the whole group of students made their way back to John Doe's apartment, stopping for pizza along the way. They arrived at John Doe's apartment at approximately 2:30 a.m. The group continued to socialize, but two of Jane Roe's friends soon fell asleep.

27.     At approximately 2:45 a.m., after the two other students fell asleep,

Jane Roe communicated to John Doe and Jacob Doe that she wanted to stay with them at the apartment, but that she wanted the other two students, friends of hers who fell asleep, to leave. Jacob Doe roused the two sleeping students and offered to get them an Uber to take them home, which they accepted. Each of the students, as they left, offered to take Jane Roe home. Jane Roe declined each time.

28.     At approximately 3:20 a.m., the other students had left, and just John Doe, Jacob Doe, and Jane Roe remained. Jacob Doe then poured each of them a mixed drink made with orange Smirnoff vodka and orange soda. This was the only alcohol consumed by the students at John Doe's apartment, and the only drink that Jacob Doe or John Doe witnessed Jane Roe consume for the entire time they were together.

29.     At 3:44 a.m., Jane Roe's friend texted her to ask how she was doing. Jane Roe responded: "I'm amazing."

30.     Soon thereafter, Jane Roe, Jacob Doe, and John Doe agreed to engage in three-way consensual activities, to which Jane Roe verbally consented. Jane Roe never withdrew her consent at any point during the encounter and was an enthusiastic participant.

31.     Eventually, following, the three students got ready for bed. Jane Roe said that she had expected to have sex with John Doe and Jacob Doe from the time that she had agreed to go to John Doe's apartment earlier that night.

32.     John Doe offered Jane Roe his roommate's vacant bed, and she accepted. The trio of students then went to sleep. When John Doe woke up at approximately 10:00 a.m., Jane Roe had already left.

33.     Unbeknownst to John Doe, at approximately 6:30 a.m., Jane Roe began

8

texting her male friend with whom she had a romantic interest. She told him that she had "made a huge mistake." This text, among other texts she sent at approximately the same time, did not contain any spelling or grammatical errors.

34.     At approximately 7:50 a.m.—when her male friend had not yet replied—Jane Roe sent him another text, this time saying that she was assaulted by Jacob Doe and John Doe. Jane Roe then said in subsequent texts that she did not remember what happened, and that she would return his winter coat. In this batch of texts, Jane Roe included several basic spelling mistakes, to give the impression that she was heavily intoxicated.

35.     Jane Roe knew that she was not assaulted by Jacob Doe or John Doe, and she decided to falsely accuse them of sexual assault. She did so with malice and with the intention of getting romantic attention from her male friend. Soon after Jane Roe sent the texts alleging that she was the victim of sexual assault, the male friend replied, offering sympathy and even telling her that he loves her.

36.     Jane Roe continued to defame Jacob Doe and John Doe to other students that morning, spreading the false accusations of sexual assault.

37.     Jane Roe then went to the hospital for a medical evaluation, following pressure from her friends after she initially refused to do so, where she made additional false and defamatory statements to the nurses about the sexual encounter with Jacob Doe and John Doe. The evaluation revealed an injury to her posterior vaginal opening, a three-millimeter by two-millimeter tear, which could be caused by consensual or non-consensual sex.

## The University conducts its Investigation

38.　　On February 10, 2019, Jane Roe submitted a false report to the University that she was sexually assaulted by Jacob Doe and John Doe. Jane Roe alleged that she was violently assaulted and was forced to have anal sex with Jacob Doe against her will. She alleged that, during this time, she was "sucking [John Doe's] dick for 10 seconds" and then stopped because she "didn't want to" anymore. She then alleged that John Doe masturbated while Jacob Doe sexually assaulted her.

39.　　Upon receiving a report of sexual assault or harassment, University policy and state law (Va. Code § 23.1-806) dictate that an Evaluation Panel must be convened to decide whether the complaint alleged a policy violation and to gather identifiable information of the respondent. The Evaluation Panel was never convened for John Doe.

40.　　On February 21, 2019, Defendant Babb notified John Doe and Jane Roe that the University opened an investigation into Jane Roe's allegations. The next day, Defendant Babb contracted with Defendant Wechsler to conduct the investigation on the University's behalf.

41.　　On February 22, 2019, the University identified two potential policy violations by John Doe: sexual assault and sexual/gender-based harassment. The University defines "sexual assault," in relevant part, as "any sexual contact or sexual intercourse that occurs without affirmative consent." The University defines "sexual/gender-based harassment," in relevant part, as "any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature,

whether verbal, non-verbal, graphic, physical, or otherwise . . . where such conduct creates a hostile environment." According to the University, "affirmative consent" exists when a person gives informed, voluntary, and "active" consent—meaning that "through the demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity." According to the University, a person cannot give "affirmative consent" if they are incapacitated or if the sexual activity is forced.

42.    The University uses a "single investigator model" procedure, wherein a single investigator both investigates the complaint and issues findings. The investigator's findings are subject to limited review by a Review Panel, before which students may appear, but the Review Panel does not conduct a *de novo* review of the investigator's findings. Instead, the Review Panel must affirm the investigator's findings unless the Panel finds that the investigator's findings are "not impartial, thorough, or fair." In this process, the investigator has significant power and control over the adjudication of the complaint.

43.    In this process, students' attorneys cannot speak for the students and cannot advocate on their behalf.

44.    In its Title IX Policy, which governed this process, the University promises "fair, thorough, and impartial investigations."

45.    Defendant Wechsler began her investigation on February 22, 2019 and interviewed Jane Roe on February 27. At that interview and at subsequent interviews, Jane Roe made statements about the sexual encounter with Jacob Doe

and John Doe that contradicted her prior statements in key respects.

46.    For example, Jane Roe told the hospital staff on the day of the alleged assault that Jacob Doe did not use a condom, but she recalled to Defendant Wechsler that she remembered seeing a used condom during the sexual encounter. Jane Roe told the hospital that she was bound, gagged, and blindfolded; whereas she told Defendant Wechsler that she was not bound at all. Jane Roe also told the hospital that she was "tossed" repeatedly between Jacob Doe and John Doe; in contrast, she told Defendant Wechsler that John Doe did not "move" her. Jane Roe also told the hospital that she performed oral sex on both Jacob Doe and John Doe; whereas she told Defendant Wechsler that she only performed oral sex on John Doe.

47.    Defendant Wechsler interviewed five student-witnesses, all whom were friendly towards Jane Roe. Defendant Wechsler interviewed none of John Doe's witnesses and did not even attempt to interview Jacob Doe, the only other eyewitness to the alleged assault. Defendant Wechsler knew that if she interviewed Jacob Doe, he would corroborate John Doe's version of events.

48.    While Wechsler did not attempt to interview Jacob Doe, the University did refer Jane Roe's complaint to JMU's Title IX Coordinator. This referral was made "with Complainant's" permission, but no University official sought John Doe's permission. Despite not seeking John Doe's permission, the referral to JMU disclosed John Doe's personal information to JMU, including his educational record at the University, in violation of FERPA. *See* 34 C.F.R. § 99.30.

49.    Defendant Wechsler obtained Jane Roe's medical records and reviewed

them in her investigation.

50. Defendant Wechsler interviewed the nurse that took Jane Roe's statement.

51. Defendant Wechsler obtained and reviewed the text messages referenced above, where Jane Roe says she is "amazing" and where she texted the male student in which she had an interest.

52. Defendant Wechsler challenged and dismissed evidence that did not conform with Jane Roe's account of events of being violently assaulted. Specifically, in her questioning of Nurse Hendrix, she tried to dismiss the inconsistencies between Jane Roe's statements by, among other things, asking repeatedly whether Nurse Hendrix took her notes as Jane Roe was speaking. Further, Defendant Wechsler asked repeatedly whether Jane Roe's vaginal injury was probative of sexual assault, after consistently getting the answer that the injury can occur from consensual and non-consensual sex.

53. On or around June 7, 2019, Defendant Wechsler sent both John Doe and Jane Roe a draft report. John Doe submitted a response that he drafted himself. Jane Roe, in violation of University policy, had an attorney draft and submit her response. Defendant Wechsler accepted Jane Roe's improper, attorney-drafted response anyway. The parties also submitted responses to the other's response, in the same fashion: John Doe drafted and submitted his own, whereas Jane Roe's attorney drafted and submitted her response—again, in violation of University policy.

54. John Doe submitted two sets of polygraph examination results, which

showed that he was "not deceptive" when he answered in the negative to three questions: "(1) did you engage in any non-consensual sexual activity with [Jane Roe]?; (2) did you have any sexual contact with [Jane Roe] when you believed that she was incapacitated?; (3) did [Jane Roe] give you any verbal or physical indication she did not want to have sexual contact with you?."

55.    John Doe offered to pay for Jane Roe's polygraph examination. Jane Roe refused to undergo a polygraph examination.

56.    After receiving the parties' filings, Defendant Wechsler published her Final Report on August 30, 2019. Defendant Wechsler found John Doe responsible for both sexual assault and sexual harassment. Specifically, she found John Doe responsible for sexual assault because she found "no evidence in the record" that Jane Roe had consented to giving John Doe oral sex. She so found despite, for example, Jane Roe's own statement that she "was sucking [John Doe's] dick" for 10 seconds and then stopped. Defendant Wechsler also dismissed John Doe's exculpatory polygraph results, stating that "the polygraph questions lack specificity or definitions that align with the Title IX Policy definitions", as if whether Jane Roe was incapacitated or subjected to non-consensual sex was not the precise issue in the case.

57.    Defendant Wechsler also found that Jane Roe was incapacitated due to alcohol intoxication and incapable of giving consent. She disregarded the 3:44 a.m. "I'm amazing" text message and the coherent early morning text messages. She disregarded the fact that Jane Roe texted other students throughout the night. She

disregarded that Jane Roe declined two rides home and even calculated the distance from John Doe's apartment to her dormitory in order to show the students that offered her a ride home that the distance was too great, thereby providing an excuse to continue socializing with John Doe and Jacob Doe. She disregarded statements by multiple witnesses that Jane Roe was "completely sober" at 8:00 a.m. when she arrived back at her dormitory.

### The Review Panel conducts a cursory review

58.    Following Defendant Wechsler's Final Report, John Doe submitted a statement contesting her findings and highlighting all of the contradictions in Jane Roe's statements.

59.    The University then convened a Review Panel, per its policy. The University, through Defendant Babb, hired Christopher Tate, an outside attorney, to "facilitate" and chair the Review Panel, and serve as a non-voting member. Three faculty or staff members were chosen: Defendant Leonard, Defendant Seneviratne, and Defendant Whaley. The Review Panel hearing was held on October 23, 2019.

60.    Defendant Leonard has a history of writing about women's issues in higher education. She has authored papers such as ""Women in Higher Education: Can They Have It All?" and has served on the University's Women's Center Advisory Committee. She has never expressed public support for any men's issue.

61.    At the outset of the Review Panel hearing, Tate instructed the parties and the voting members of the Panel that Defendant Wechsler has the discretion to determine the relevancy of all of the evidence in the case and that if something is

redacted or not included in the Final Report, the Panel is not to consider it.

62.    Tate noted that the Review Panel process was administrative and was to be conducted consistent with due process of law. Tate noted, however, that parties' attorneys were not to speak during the proceeding, except to advise their clients privately.

63.    Neither party was allowed to question the other directly. Instead, parties had to submit questions privately to Tate, who would determine, in his sole discretion, whether the question was relevant.

64.    Parties and witnesses do not give testimony under oath, but on the "honor system."

65.    The Review Panel hearing began with brief opening statements. Following opening statements, the Panel began asking John Doe questions, in violation of an agenda provided which indicated that Jane Roe would answer questions first. John Doe raised this violation of procedure and Tate responded that they would proceed with questioning him first anyway.

66.    John Doe answered all questions posed to him. Jane Roe answered some of the questions posed to them and declined to answer others. Jane Roe admitted that her attorney drafted her responses, however, but also stated that she dictated the response to her attorney.

67.    Defendant Wechsler revealed during her testimony that she has conducted around thirty Title IX investigations at the University and was previously involved with the implementation of the Dear Colleague Letter in Pennsylvania, in

addition to being involved in women's issues and "victim services" during her work in Pennsylvania's government. Defendant Wechsler stated that although she is external, she is "intimately familiar" with all of the policies and procedures at the University since she has been working with the University since the policies' inception.

68.    Defendant Wechsler was asked during questioning how she resolved the discrepancy between Jane Roe's statement at the hospital (recorded by Nurse Hendrix) that Jacob Doe put his hand over her mouth and Jane Roe's statement to Defendant Wechsler that she put her own hand over her mouth. Defendant Wechsler simply replied that she gave more weight to Jane Roe's statement to her, since that was "her self-report." This answer completely ignores the fact that both statements were purportedly Jane Roe's self-report, which created the discrepancy in the first place.

69.    Defendant Wechsler in the Review Panel hearing could not remember whether she had any contact with Jacob Doe during her investigation, the only other eyewitness.

70.    Defendant Wechsler acknowledged in the Review Panel hearing that Jane Roe said she was "sucking on [John Doe]'s penis" and that is the only sexual contact alleged by Jane Roe.

71.    Defendant Wechsler admitted that her Final Report said that Jane Roe reported that John Doe put his penis in her mouth, even though Jane Roe never said that.

72.    Defendant Wechsler confirmed her disregard of all witness testimony that indicated that Jane Roe was not drunk. Defendant Wechsler admitted that Jane Roe only had one drink between 2:30 a.m. and 8:00 a.m., and yet she found that Jane Roe was incapacitated from alcohol consumption. In total, Defendant Wechsler found that Jane Roe had two to three shots at the beginning of the night, one half of a light beer can a couple hours later, then a mixed drink, and then a tequila sunrise shortly thereafter, and finally the single mixed drink at John Doe's apartment. At maximum, this was six-and-a-half drinks over the course of six to ten hours, which is a rate of drinking unlikely to result in incapacitation for a healthy, non-medicated person.

73.    Defendant Wechsler confirmed that there was no evidence that Jane Roe was drugged.

74.    When Tate asked Defendant Wechsler how she concluded that Jane Roe was incapacitated given the low amount of alcohol she consumed, Defendant Wechsler initially stated that she lacked the expertise to speculate about Jane Roe's Blood Alcohol Content (BAC), and then asked for a break and asked to "consult with somebody before she answers." This statement completely undermines her conclusion that Jane Roe was incapacitated; if she cannot "speculate" as to Jane Roe's BAC, she could not have found that she was incapacitated, except by blindly accepting Jane Roe's statements to the exclusion of all contradicting evidence.

75.    Defendant Wechsler revealed that she consulted with Defendant Babb for how to answer Tate's question.

76.    Defendant Wechsler later stated, after the break, that she reconciled her

18

incapacitation conclusion with Jane Roe being sober at 8:00 a.m., because "a sobering event had taken place." This shows again that Defendant Wechsler reasoned backwards from her conclusion that Jane Roe was telling the truth, which denied Doe his right to be presumed not-responsible. There is no scientific or logical basis for "sobering up" more quickly under duress, even if that duress occurred.

77.     Defendant Wechsler also revealed that she relied on a witness's testimony that Jane Roe was drunk. That witness was admittedly very drunk, did not remember going to John Doe's apartment, and was stumbling. Defendant Wechsler called his testimony "compelling."

78.     Defendant Wechsler confirmed that she did not review any literature of the reliability of polygraphs when she determined that polygraphs are not supported by the scientific literature.

79.     In responding to another question, Defendant Wechsler stated that she "could go on and on and on as to my opinions [about the parties] but that may not be fair to [John Doe]," a plain statement of her bias against John Doe.

80.     Following brief closing statements from the parties, the Review Panel hearing concluded at 3:22 p.m.

81.     At 4:13 p.m., the Review Panel finished its deliberations and made its findings. The Panel *unanimously affirmed* Defendant Wechsler's investigation and findings. The Panel found that Defendant Wechsler's investigation was "fair, thorough, and impartial," contrary to all discrediting statements made by Defendant Wechsler during the Review Panel hearing.

82.    Immediately after announcing that the Panel had affirmed Defendant Wechsler's findings, it moved to the sanction phase. After hearing brief statements from the parties, including Jane Roe's request to expel John Doe, it made its decision. The Panel expelled John Doe, six months before he was set to graduate. The Review Panel made its determination on the day after the last day to withdraw from classes, meaning that John Doe could no longer withdraw for the semester without paying tuition. The timing of the Review Panel and its decision meant that John Doe was forced to pay for the entire Fall 2019 semester that he did not attend.

83.    The Review Panel issued its Final Outcome Letter on October 28, 2019.

### The impact on John Doe

84.    Shortly before he was expelled, John Doe was issued an offer as an entry level engineer upon graduation at a prestigious firm. He lost that offer as a result of his expulsion.

85.    John Doe transferred to another, much less prestigious university on the other side of the country, where he was required to attend an additional year of classes to graduate. This requirement would have been the same regardless of where he transferred.

86.    As a result of his wrongful expulsion, John Doe suffers severe emotional and psychological harm.

87.    Defendants have also caused John Doe severe financial harm. John Doe will face extreme difficulty in any graduate school admissions process and in any job application that asks for his transcript or college record. This wrongful expulsion

effectively destroys his career prospects and will prevent him from earning the level of income he otherwise would have expected based on his hard work and educational success. Further, this result threatens his liberty to pursue his occupation of choice because he will not be hired anywhere that asks for his college record or a college recommendation.

### CAUSES OF ACTION

#### COUNT I:
#### Violation of Title IX

#### (Against the University of Virginia)

88.    John Doe incorporates by reference the above paragraphs as though set forth fully herein.

89.    John Doe was a student at the University, entitling him to rights under Title IX. 20 U.S.C. §§ 1681 *et seq.*

90.    The University receives federal funding.

91.    The University discriminated against John Doe on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against John Doe as a male student throughout the same.

92.    The University was motivated by pressure from the Department of Education to find male students responsible and expel them, as per the federal government's statements in the Resolution Agreement.

93.    The University exhibited anti-male bias against John Doe by (1) immediately believing the female student's statements and not permitting Doe to

meaningfully challenge their testimony via an adversarial hearing; (2) discrediting all witnesses that did not corroborate the female complainant's version of events; (3) refusing to contact the other eyewitness in the case, Jacob Doe; (4) uniformly crediting Jane Roe's statements, even when self-contradictory, and summarily disbelieving John Doe's statements, testimony, and supporting documents; (5) mischaracterizing Jane Roe's statements to find John Doe responsible; (6) refusing to consider John Doe's polygraph results on the basis of the lack of scientific support, when the investigator reviewed no scientific literature; and (7) issuing and affirming findings that Jane Roe was incapacitated despite significant contradictory evidence. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

94.    The University's decision to discipline John Doe and issue sanctions against him was motivated and caused by its bias against John Doe on the basis of his male sex.

95.    There is no legitimate, nondiscriminatory reason for the University's behavior.

96.    Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

97.    John Doe has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against him. Therefore, John Doe requests compensatory damages, declaratory relief in the form of a declaration stating the University unlawfully discriminated against him on the basis

of his sex, injunctive relief clearing his disciplinary record at the University, and any other relief the Court deems just and proper.

## COUNT II:
### Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution

### (Against individual Defendants sued in their individual capacities, under 42 U.S.C. § 1983)

98.     John Doe incorporates by reference the above paragraphs as though set forth fully herein.

99.     The University is a state institution established by the Commonwealth of Virginia. The individual Defendants are "persons" operating under "the color of state law" because they were employees or agents of the state government, exercising state power, at all times relevant herein.

100.    The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

101.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

102.    John Doe had a property interest in his education as a result of the contractual relationship existing between him and the University, in which he paid tuition and fees in exchange for receiving an education and the University's promise that John Doe would not be treated unlawfully by the University or in violation of its procedures. John Doe's property interest was secured by his payment of tuition.

103.   John Doe had a liberty interest in his reputation and status as a student because (1) he had an interest in pursuing his occupation of choice (as an engineer educated at a leading university) and (2) Defendants extinguished his right to an education (having paid tuition). Defendants, by their unlawful actions, altered John Doe's legal status as an undergraduate student and caused him to lose a confirmed job as an engineer. Further, Defendants harmed John Doe's liberty interest in his reputation by their erroneous determination that John Doe committed sexual offenses, which will prevent him from continuing his education elsewhere and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

104.   Babb, acting on behalf of the University, deprived John Doe of his due process rights to some form of live hearing with some form of cross-examination and denied him his due process right to a meaningful appeal. Defendant Wechsler deprived John Doe of his due process rights by using the Single Investigator Model to conduct her investigation, which among other things (1) failed to afford John Doe a meaningful opportunity to be heard; (2) failed to afford him the opportunity to confront his accuser; (3) failed to allow him to conduct any investigation whatsoever; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense. The Review Panel Defendants (Defendant Leonard, Defendant Seneviratne, and Defendant Whaley) compounded these deprivations of due process when they affirmed Defendant Wechsler's findings. Defendant Babb oversaw these

deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

105. All individual Defendants sued in their official capacity had the authority to rectify the due process deficiencies in this case. All chose not to do so.

106. These individual Defendants, as agents of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving John Doe adequate procedural safeguards during the adjudication of the charges against him.

107. This finding will severely limit—if not destroy—John Doe's future professional career. John Doe will likely be unable to continue his education into graduate school with this finding on his record and will face severe and irreparable harm to his ability to seek employment, absent judicial intervention.

108. John Doe requests compensatory damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against all individual Defendants sued in their individual capacities.

## COUNT III:
### Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution

**(Against James Ryan in his official capacity as President of the University, under 42 U.S.C. § 1983)**

109. John Doe incorporates by reference the above paragraphs as though set forth fully herein.

25

110.   The University is a state institution established by the Commonwealth of Virginia. The individual Defendants are "persons" operating under "the color of state law" because they were employees or agents of the state government, exercising state power, at all times relevant herein.

111.   The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

112.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

113.   John Doe had a property interest in his education as a result of the contractual relationship existing between him and the University, in which he paid tuition and fees in exchange for receiving an education and the University's promise that John Doe would not be treated unlawfully by the University or in violation of its procedures. John Doe's property interest was secured by his payment of tuition.

114.   John Doe had a liberty interest in his reputation and status as a student because (1) he had an interest in pursuing his occupation of choice (as an engineer educated at a leading university) and (2) Defendants extinguished his right to an education (having paid tuition). Defendants, by their unlawful actions, altered John Doe's legal status as an undergraduate student and caused him to lose a confirmed job as an engineer. Further, Defendants harmed John Doe's liberty interest in his reputation by their erroneous determination that John Doe committed sexual offenses, which will prevent him from continuing his education elsewhere and will

26

forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

115.   Babb, acting on behalf of the University, deprived John Doe of his due process rights to some form of live hearing with some form of cross-examination and denied him his due process right to a meaningful appeal. Defendant Wechsler deprived John Doe of his due process rights by using the Single Investigator Model to conduct her investigation, which among other things (1) failed to afford John Doe a meaningful opportunity to be heard; (2) failed to afford him the opportunity to confront his accuser; (3) failed to allow him to conduct any investigation whatsoever; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense. The Review Panel Defendants (Defendant Leonard, Defendant Seneviratne, and Defendant Whaley) compounded these deprivations of due process when they affirmed Defendant Wechsler's findings. Defendant Babb oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

116.   These individual Defendants, as agents of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving John Doe adequate procedural safeguards during the adjudication of the charges against him.

117.   This finding will severely limit—if not destroy—John Doe's future professional career. John Doe will likely be unable to continue his education into

graduate school with this finding on his record and will face severe and irreparable harm to his ability to seek employment, absent judicial intervention.

118.   John Doe requests declaratory and injunctive relief against James Ryan in the form of (1) a permanent injunction prohibiting him or any agent of the University from making or maintaining any notation on Doe's professional or educational record relating to the investigation of the Jane Roe's complaint at the University and from taking any further action depriving John Doe of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated John Doe's right to due process and a declaration that the Due Process Clause requires a live hearing with some form of live cross examination in this context.

## COUNT IV

### Breach of contract

### (Against the University)

119.   In accepting the University's offer of admission, John Doe accepted the University's offer to enter into a contractual relationship wherein John Doe would pay tuition and the University would provide an education.

120.   John Doe further agreed to be bound by University policies, and the University agreed to follow its own policies. These terms were express or implied-in-fact because the policies were published by the University and John Doe agreed in writing to abide by them.

121.   The University breached its contract with John Doe when it breached its own policies and procedures in its adjudication of the complaint against John Doe. Specifically, the University breached its contract when it failed to convene an Evaluation Panel, failed to afford Doe a "fair, thorough, and impartial" investigation of the complaint against him, failed to gather "relevant and available evidence" including the testimony of Jacob Doe, and failed to enforce its policy against advisors providing testimony.

122.   As a result of the University's breach, John Doe has suffered substantial financial harm, including having to pay for an additional year of tuition at his transfer school, transportation costs associated therewith, and having to pay for psychological care. Accordingly, John Doe requests compensatory and incidental damages.

## COUNT V

### Tortious interference with contractual relations

### (Against individual Defendants sued in their individual capacities)

123.   A valid contract existed between the University and John Doe.

124.   All individual defendants sued in their individual capacities knew that a contract existed between the University and John Doe, in the form of John Doe's promise to pay tuition in exchange for an education and the promise of the University to not expel Doe in violation of its own policies.

125.   Defendant Wechsler intentionally interfered with this contractual relationship when she, as the agent entrusted with the University's obligation to

provide a "fair, thorough, and impartial investigation" and to "gather relevant and available evidence," failed to do so. Review Panel Defendants (Defendant Leonard, Defendant Seneviratne, and Defendant Whaley) intentionally interfered with this contractual relationship when they wrongly affirmed Defendant Wechsler's findings, depriving John Doe of his contractual right to a "fair, thorough, and impartial investigation." Defendant Babb intentionally interfered with this contractual relationship when she interfered with the contractually mandated Review Panel hearing process and instructed Defendant Wechsler how to answer questions, when she failed to convene an Evaluation Panel for John Doe, and when she failed to ensure a "fair, thorough, and impartial investigation."

126.    As a result of Defendants' tortious interference, John Doe has suffered substantial financial, emotional, and psychological harm.

## PRAYER FOR RELIEF

WHEREFORE John Doe respectfully requests that this Court grant him the following relief against all Defendants:

1. Damages in the amount to be proved at trial, up to $5,000,000;

2. Punitive Damages in the amount of $500,000;

3. Costs of suit;

4. Attorneys' fees, pursuant to 42 U.S.C § 1988(b);

5. Injuctive relief in the form of expunging his academic disciplinary record and rescinding a no-trespass order by the University;

6. Such other and further relief as the Court deems necessary and proper.

30

Dated: October 22, 2021

John Doe
By Counsel

BINNALL LAW GROUP, PLLC

Jesse R. Binnall, VSB No. 79292
717 King Street, Suite 300
Alexandria, VA 22314
(703) 888-1943
(703) 888-1930 – facsimile
jesse@binnall.com

*Counsel for Plaintiff John Doe*