IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| JOHN DOE,[1] | |
| Plaintiff, | |
| v. | Case No. 3:22-cv-00064-NKM |
| UNIVERSITY OF VIRGINIA; | |
| CHRISTINE WECHSLER,<br>*In her individual capacity;* | **FIRST AMENDED COMPLAINT** |
| EMILY BABB,<br>*In her individual capacity;* | JURY TRIAL DEMANDED |
| REBECCA LOCKE LEONARD,<br>*In her individual capacity;* | |
| RAJIVA SENEVIRATNE,<br>*In his individual capacity;* | |
| DIANE WHALEY,<br>*In her individual capacity;* | |
| and | |
| JAMES E. RYAN<br>*In his official capacity;* | |
| Defendants. | |

---

[1] "John Doe" is not the plaintiff's true name. His identity is known to the parties. Plaintiff will promptly move this Court for leave to proceed pseudonymously in this litigation.

## FIRST AMENDED COMPLAINT

John Doe was a student at the University of Virginia when he was wrongfully accused of sexual assault by a female student. Using a process violative of constitutional due process and riddled with bias on the basis of sex, the University and its agents erroneously found Doe "responsible" for this false accusation. Pursuant to Fed. R. Civ. P. 15(a), Plaintiff John Doe hereby files this First Amended Complaint against all Defendants and states as follows:

1. This is a civil action against Defendants for violations of Title IX (20 U.S.C. §§ 1681 *et seq.*), violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, breach of contract, and tortious interference with contractual relations.

## PARTIES

2. John Doe was, at all times relevant to the allegations, an undergraduate student at the University of Virginia. He is domiciled in Florida.

3. The University of Virginia (the "University") is a state government entity, located in Charlottesville, Virginia.

4. Christine Wechsler is an attorney and was, at all times relevant to the allegations, the investigator retained by the University to conduct its investigation into John Doe's alleged conduct. Upon information and belief, she is domiciled in Pennsylvania.

5. Emily Babb is an attorney and was, at all times relevant to the allegations, the Title IX Coordinator at the University, responsible for the

University's compliance with Title IX and the United States Constitution. Upon information and belief, she is now domiciled in Colorado.

6.      Rebecca Locke Leonard was a member of the University Review Panel that affirmed the findings against Doe. She is an employee of the University and is domiciled in Virginia.

7.      Rajiva Seneviratne was a member of the University Review Panel that affirmed the findings against Doe. He is an employee of the University and is domiciled in Virginia.

8.      Diane Whaley was a member of the University Review Panel that affirmed the findings against Doe. She is an employee of the University and is domiciled in Virginia.

9.      James E. Ryan is an attorney and is the President of the University with ultimate authority over its operations, including its resolution of sexual assault complaints filed by students.

## JURISDICTION AND VENUE

10.     This Court possesses federal question subject matter jurisdiction over this case per 28 U.S.C. § 1331 because this case arises, in part, out of Defendants' violations of federal law.

11.     This Court possesses personal jurisdiction over the University because it is a Virginia government entity, and over the individual Defendants domiciled in Virginia by virtue of their domicile. Personal jurisdiction is proper over out-of-state Defendants because they transacted business in Virginia, contracted to supply

services or things in Virginia, or caused tortious injury in Virginia. Va. Code § 8.01-328.1(A).

12.     Venue is proper in this Court because all causes of action arose in this judicial district. 28 U.S.C. § 1391.

## BACKGROUND

### University's Background

13.     Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX. Title IX is a federal statute prohibiting discrimination on the basis of sex in educational institutions that receive federal funding. 20 U.S.C. § 1681.

14.     Should the University fail to adequately remedy sexual harassment on campus, it could face litigation from alleged victims of sexual assault. These plaintiffs tend to be female.

15.     In April 2011, the pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This guidance, despite not having undergone the formal rulemaking process, demanded universities receiving federal funding weaken procedural protections for accused students, including limiting the right to a hearing for students accused of sexual harassment and lowering the burden of proof to preponderance of the evidence. The Dear Colleague Letter and later-issued guidance publicized statistics of a supposed "rape epidemic" on college campuses targeting female students. These statistics are demonstrably false and debunked.

16.     Students accused of sexual misconduct on campus overwhelmingly tend to be male.

17.     The Dear Colleague Letter and later-issued guidance incentivized universities receiving federal funding, including Defendant University, to find male accused students responsible regardless of the weight of the evidence against them. If the Department of Education saw the University as insufficiently protective of alleged female sexual harassment victims, the Department of Education could withdraw federal funding from the University.

18.     Defendant University receives federal funding.

19.     Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

20.     Increasing the pressure on the University even further, the Department of Education previously opened an investigation into the University and its handling of female students' sexual misconduct complaints.

21.     On September 21, 2015, the Department of Education issued a "findings letter" that the University had violated Title IX by, among other things, insufficiently addressing complaints of sexual assault and harassment by female students and, accordingly, the University entered into a Resolution Agreement with the Department. The letter exclusively discussed complaints by female students (with the exception of one male student complaint filed in tandem with female student complaints against a professor) and encouraged the University to expel students accused of sexual assault by harshly criticizing the University's decisions not to expel

5

accused students. The letter also notified the University that the Department would monitor the University to test its compliance and would initiate enforcement proceedings if it did not comply.

22.     Therefore, the University and its employees had an incentive to find John Doe responsible and expel him, as a male accused student, regardless of the weight of evidence against him. This, in turn, provided the University and its employees with incentive to limit any chance John Doe had at defending himself by removing procedural due process protections, and to infect the investigation and adjudication with bias against him on the basis of sex.

23.     The Dear Colleague Letter was rescinded in 2017. The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX Office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus, including the Resolution Agreement.

### John Doe, Jacob Doe, and Jane Roe[2]

24.     After excelling academically in high school, John Doe enrolled in the University in the Fall 2017 semester. At all times during his enrollment at the University, he was a successful computer engineering major on track to graduate in the Spring 2020 semester.

---

[2] Jacob Doe and Jane Roe are not these students' real names. Due to the sensitive nature of these allegations, their true identities are omitted. All Defendants know their true identities.

25.     Jacob Doe, at all times relevant to the allegations, was a student at James Madison University (JMU). Jacob Doe and John Doe were friends before they began college and remained in touch throughout John Doe's time at the University.

26.     Jane Roe was a female student at the University at all times relevant to the allegations. John Doe and Jane Roe knew each other throughout their time at the University.

<u>The Incident</u>

27.     On or about February 8, 2019, Jacob Doe came to visit John Doe. The two friends went out drinking.

28.     John Doe and Jacob Doe made their way to various student parties on or around the University campus.

29.     Upon leaving the last party, at approximately 1:40 a.m., the two friends ran into another group of students. This group of students included Jane Roe and two other students. At that time, Jane Roe did not appear intoxicated.

30.     The whole group of students decided to go back to John Doe's apartment, stopping for pizza along the way. They arrived at John Doe's apartment at approximately 2:30 a.m.

31.     The group continued to socialize at John Doe's apartment, during which time two of Jane Roe's friends fell asleep.

32.     At approximately 2:45 a.m., after the two other students fell asleep, Jane Roe communicated to John Doe and Jacob Doe that she wanted to stay with

them at the apartment, but that she wanted the other two students, friends of hers who fell asleep, to leave.

33.     Accordingly, Jacob Doe roused the two sleeping students and offered to get them an Uber to take them home, which they accepted. Each of the students, as they left, offered to take Jane Roe home. Jane Roe declined each time.

34.     In declining the two rides home, Jane Doe even calculated the distance from John Doe's apartment to her dormitory in order to show the students who offered her a ride home that the distance was too great, thereby providing an excuse to continue socializing with John Doe and Jacob Doe.

35.     At approximately 3:20 a.m., the other students had left, and just John Doe, Jacob Doe, and Jane Roe remained. Jacob Doe poured each of them a mixed drink made with orange Smirnoff vodka and orange soda. This was the only alcohol consumed by the students at John Doe's apartment, and the only drink that Jacob Doe or John Doe witnessed Jane Roe consume for the entire time they were together.

36.     At 3:44 a.m., Jane Roe's friend texted her to ask how she was doing. Jane Roe responded: "I'm amazing."

37.     Soon thereafter, Jane Roe suggested that the three students engage in three-way sexual activities. Jacob Doe and John Doe consented to the sexual activity that Jane Roe suggested and the three engaged as such. After suggesting the sexual activity, Jane Roe never withdrew her consent at any point during the encounter and was an enthusiastic participant.

38.     Following the sexual activity, the three students got ready for bed. During this time, Jane Roe told John Doe and Jacob Doe that she had expected to have sex with them from the time that she had agreed to go to John Doe's apartment earlier that night.

39.     John Doe offered Jane Roe his roommate's vacant bed. She accepted. The trio of students then went to sleep.

40.     When John Doe woke up at approximately 10:00 a.m., Jane Roe had already left.

41.     Unbeknownst to John Doe, at approximately 6:30 a.m., Jane Roe began texting her male friend in whom she had a romantic interest. She told him that she had "made a huge mistake." This text, among other texts she sent at approximately the same time, did not contain any spelling or grammatical errors.

42.     At approximately 7:50 a.m., after her male friend had not yet replied, Jane Roe sent him another text. This time, she stated that she was assaulted by Jacob Doe and John Doe. In subsequent texts, however, Jane Roe stated that she did not remember what happened. In this batch of texts, Jane Roe included several basic spelling mistakes, apparently to give the false impression that she was heavily intoxicated.

43.     Jane Roe knew that she was not assaulted by Jacob Doe or John Doe; yet she decided to falsely accuse them of sexual assault anyway. She did so with malice and with the intention of getting romantic attention from her male friend.

Soon after Jane Roe sent the texts alleging that she was the victim of sexual assault, the male friend replied, offering sympathy and even telling her that he loves her.

44.    Jane Roe continued to defame Jacob Doe and John Doe to other students that morning, spreading the false accusations of sexual assault.

45.    Following pressure from her friends after she initially refused, Jane Roe eventually went to the hospital for a medical evaluation, where she made additional false and defamatory statements to the nurses about the sexual encounter with Jacob Doe and John Doe. The evaluation did reveal a slight tear, which could be caused by consensual or non-consensual sex, as indicated by the nurse.

46.    The medical report from this visit described Jane Roe at 10:57 a.m. as being "alert, oriented, in no acute physical distress." The nurse would later remark in her interview that Jane Roe "did not seem to be intoxicated at all."

### The University conducts its Investigation

47.    On February 10, 2019, Jane Roe submitted a false report to the University that she was sexually assaulted by Jacob Doe and John Doe. Jane Roe alleged that she was violently assaulted and was forced to have anal sex with Jacob Doe against her will. She alleged that, during this time, she was "sucking [John Doe's] dick for 10 seconds" and then stopped because she "didn't want to" anymore. Finally, she alleged that John Doe masturbated while Jacob Doe sexually assaulted her.

48.    Upon receiving a report of sexual assault or harassment, University policy and state law (Va. Code § 23.1-806) dictate that an Evaluation Panel must be convened to decide whether the complaint alleged a policy violation and to gather

identifiable information of the respondent. Despite later asserting that it convened an Evaluation Panel, the University never convened an Evaluation Panel as to John Doe.

49.     On February 21, 2019, Defendant Babb notified John Doe and Jane Roe that the University opened an investigation into Jane Roe's allegations. The next day, Defendant Babb contracted with Defendant Wechsler to conduct the investigation on the University's behalf.

50.     The University has a policy or practice of not disciplining students arbitrarily or without cause; rather, it maintains conduct policies, only by or through which it may discipline students. Indeed, the purpose of such a policy is to articulate the very reasons why a student might expect to be disciplined.

51.     On February 22, 2019, the University identified two potential policy violations by John Doe: sexual assault and sexual/gender-based harassment.

52.     The University defines "sexual assault," in relevant part, as "any sexual contact or sexual intercourse that occurs without affirmative consent."

53.     The University defines "sexual/gender-based harassment," in relevant part, as "any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical, or otherwise . . . where such conduct creates a hostile environment."

54.     According to the University, "affirmative consent" exists when a person gives informed, voluntary, and "active" consent—meaning that "through the

demonstration of clear words or actions, a person has indicated permission to engage in mutually agreed-upon sexual activity."

55.     Also, according to the University, a person cannot give "affirmative consent" if they are incapacitated or if the sexual activity is forced.

56.     The University uses a slightly modified "single investigator model" procedure, wherein a single investigator both investigates the complaint and issues findings. The investigator's findings are subject to limited review by a Review Panel, before which students may appear, but the Review Panel does not conduct a *de novo* review of the investigator's findings. For all practical purposes, the Review Panel affirms the investigator's findings unless the Panel finds that the investigator's findings are "not impartial, thorough, or fair." In this process, the investigator has significant power and control over the adjudication of the complaint.

57.     In the University's process, students' attorneys cannot speak for the students and cannot advocate on their behalf.

58.     In its Title IX Policy, which governed this process, the University promises "fair, thorough, and impartial investigations."

59.     Defendant Wechsler began her investigation on February 22, 2019.

60.     Defendant Wechsler interviewed Jane Roe on February 27, 2019. During that interview, and at subsequent interviews, Jane Roe made statements about the sexual encounter with Jacob Doe and John Doe that contradicted her prior statements in key respects.

61.     For example, Jane Roe told the hospital staff on the day of the alleged assault that Jacob Doe did not use a condom, but she recalled to Defendant Wechsler that she remembered seeing a used condom during the sexual encounter. Jane Roe told the hospital that she was bound, gagged, and blindfolded, whereas she told Defendant Wechsler that she was not bound at all. Jane Roe also told the hospital that she was "tossed" repeatedly between Jacob Doe and John Doe; in contrast, she told Defendant Wechsler that John Doe did not "move" her. Jane Roe also told the hospital that she performed oral sex on both Jacob Doe and John Doe, whereas she told Defendant Wechsler that she only performed oral sex on John Doe.

62.     Defendant Wechsler indicated her biases against males throughout her investigation.

63.     For instance, Defendant Wechsler only interviewed five student-witnesses, all of whom were friendly towards Jane Roe. She interviewed none of John Doe's requested witnesses, which included University athletic coaches or trainers, who were able to identify previous injuries and/or describe rigorous physical activities in which Jane Roe had been involved within the timeframe of her complaint. Defendant Wechsler did not even attempt to interview Jacob Doe, the only other eyewitness to the alleged assault. Defendant Wechsler knew that if she interviewed Jacob Doe, he would corroborate John Doe's version of events.

64.     While Defendant Wechsler did not attempt to interview Jacob Doe, the University did refer Jane Roe's complaint to JMU's Title IX Coordinator. This referral was made "with Complainant's" permission, but no University official sought John

Doe's permission. Despite not seeking John Doe's permission, the referral to JMU disclosed John Doe's personal information to JMU, including his educational record at the University, in violation of FERPA. *See* 34 C.F.R. § 99.30.

65.     Defendant Wechsler obtained Jane Roe's medical records and reviewed them in her investigation.

66.     Defendant Wechsler interviewed the nurse that took Jane Roe's statement.

67.     Defendant Wechsler obtained and reviewed the text messages referenced above, where Jane Roe says she is "amazing" and where she texted the male student in which she had an interest.

68.     Defendant Wechsler challenged and dismissed evidence that did not conform with Jane Roe's account of events of being violently assaulted. Specifically, in her questioning of Nurse Hendrix, she tried to dismiss the inconsistencies between Jane Roe's statements by, among other things, asking repeatedly whether Nurse Hendrix took her notes as Jane Roe was speaking. Further, Defendant Wechsler asked repeatedly whether Jane Roe's tear was probative of sexual assault, after consistently getting the answer that the injury can occur from consensual and non-consensual sex.

69.     On or around June 7, 2019, Defendant Wechsler sent both John Doe and Jane Roe a draft report.

70.     John Doe submitted a response that he drafted himself. Jane Roe, in violation of University policy, had an attorney draft and submit her response.

Defendant Wechsler accepted Jane Roe's improper, attorney-drafted response anyway.

71.     The parties also submitted responses to the other's response. Again, John Doe drafted and submitted his own, whereas Jane Roe's attorney drafted and submitted her response, in violation of University policy and over John Doe's objection.

72.     John Doe submitted two sets of polygraph examination results. Each of the results showed that he and Jacob Doe were "not deceptive" when they answered in the negative to three questions: "(1) did you engage in any non-consensual sexual activity with [Jane Roe]?; (2) did you have any sexual contact with [Jane Roe] when you believed that she was incapacitated?; and (3) did [Jane Roe] give you any verbal or physical indication she did not want to have sexual contact with you?"

73.     John Doe offered to pay for Jane Roe's polygraph examination. Jane Roe refused to undergo a polygraph examination.

74.     After receiving the parties' filings, Defendant Wechsler published her Final Report on August 30, 2019.

75.     In her report, Defendant Wechsler found John Doe responsible for both sexual assault and sexual harassment. Specifically, she found John Doe responsible for sexual assault because she found "no evidence in the record" that Jane Roe had consented to giving John Doe oral sex. She so found despite, for example, Jane Roe's own statement that she "was sucking [John Doe's] dick" for 10 seconds and then stopped. Defendant Wechsler also dismissed John Doe's exculpatory polygraph

results, stating that "the polygraph questions lack specificity or definitions that align with the Title IX Policy definitions," as if whether Jane Roe was incapacitated or subjected to non-consensual sex was not the precise issue in the case.

76.     Defendant Wechsler also found that Jane Roe was incapacitated due to alcohol intoxication and incapable of giving consent. She disregarded the 3:44 a.m. "I'm amazing" text message and the coherent early morning text messages. Likewise, she disregarded the fact that Jane Roe texted other students throughout the night. Defendant Wechsler also disregarded the fact that Jane Roe declined two rides home and that Jane Doe even calculated the distance from John Doe's apartment to her dormitory in order to show the students who offered her a ride home that the distance was too great, thereby providing an excuse to continue socializing with John Doe and Jacob Doe. She disregarded statements by multiple witnesses that Jane Roe was "completely sober" at 8:00 a.m. when she arrived back at her dormitory.

## The Review Panel conducts a cursory review

77.     Following Defendant Wechsler's Final Report, John Doe submitted a statement contesting her findings and highlighting all of the contradictions in Jane Roe's statements.

78.     The University convened a Review Panel, per its policy. The University, through Defendant Babb, hired Christopher Tate, an outside attorney, to "facilitate" and chair the Review Panel, and serve as a non-voting member.

79.     Three faculty or staff members were chosen for the Review Panel: Defendant Leonard, Defendant Seneviratne, and Defendant Whaley.

80.     The Review Panel hearing was held on October 23, 2019.

81.     Defendant Leonard has a history of writing about women's issues in higher education. She has authored papers such as "Women in Higher Education: Can They Have It All?" and has served on the University's Women's Center Advisory Committee. She has never expressed public support for any men's issue.

82.     At the outset of the Review Panel hearing, Tate instructed the parties and the voting members of the Panel that Defendant Wechsler has the discretion to determine the relevancy of all of the evidence in the case and that if something is redacted or not included in the Final Report, the Panel is not to consider it.

83.     Tate noted that the Review Panel process was administrative and was to be conducted consistent with due process of law. Tate noted, however, that parties' attorneys were not to speak during the proceeding, except to advise their clients privately.

84.     Neither party was allowed to question the other directly. Instead, parties had to submit questions privately to Tate, who would determine, in his sole discretion, whether the question was relevant.

85.     Parties and witnesses do not give testimony under oath, but on the "honor system."

86.     The Review Panel hearing began with brief opening statements. Following opening statements, the Panel began asking John Doe questions, in violation of an agenda provided which indicated that Jane Roe would answer

questions first. John Doe raised this violation of procedure and Tate responded that they would proceed with questioning him first anyway.

87.     John Doe answered all questions posed to him. Jane Roe answered some of the questions posed to her and declined to answer others. Jane Roe admitted that her attorney drafted her responses, but also stated that she dictated the responses to her attorney.

88.     Defendant Wechsler revealed during her testimony that she has conducted around thirty Title IX investigations at the University and was previously involved with the implementation of the Dear Colleague Letter in Pennsylvania, in addition to being involved in women's issues and "victim services" during her work in Pennsylvania's government. Defendant Wechsler stated that although she is external, she is "intimately familiar" with all of the policies and procedures at the University since she has been working with the University since the policies' inception.

89.     Defendant Wechsler was asked during questioning how she resolved the discrepancy between Jane Roe's statement at the hospital (recorded by Nurse Hendrix) that Jacob Doe put his hand over her mouth and Jane Roe's statement to Defendant Wechsler that she put her own hand over her mouth. Defendant Wechsler simply replied that she gave more weight to Jane Roe's statement to her, since that was "her self-report." This answer completely ignores the fact that both statements were purportedly Jane Roe's self-report, which created the discrepancy in the first place.

90.    Defendant Wechsler in the Review Panel hearing could not remember whether she had any contact with Jacob Doe during her investigation, the only other eyewitness.

91.    Defendant Wechsler acknowledged in the Review Panel hearing that Jane Roe said she was "sucking on [John Doe]'s penis" and that is the only sexual contact alleged by Jane Roe between her and John Doe.

92.    Defendant Wechsler admitted that her Final Report said that Jane Roe reported that John Doe put his penis in her mouth, even though Jane Roe never said that.

93.    Defendant Wechsler confirmed her disregard of all witness testimony that indicated that Jane Roe was not drunk. Defendant Wechsler admitted that Jane Roe only had one drink between 2:30 a.m. and 8:00 a.m., and yet she found that Jane Roe was incapacitated from alcohol consumption. In total, Defendant Wechsler found that Jane Roe had two to three shots at the beginning of the night, one half of a light beer can a couple hours later, then a mixed drink, and then a tequila sunrise shortly thereafter, and finally the single mixed drink at John Doe's apartment. At maximum, this was six-and-a-half drinks over the course of six to ten hours, which is a rate of drinking unlikely to result in incapacitation for a healthy, non-medicated person of her height and weight.

94.    Defendant Wechsler confirmed that there was no evidence that Jane Roe was drugged.

95.     When Tate asked Defendant Wechsler how she concluded that Jane Roe was incapacitated given the low amount of alcohol she consumed, Defendant Wechsler initially stated that she lacked the expertise to speculate about Jane Roe's Blood Alcohol Content (BAC), and then asked for a break and asked to "consult with somebody before she answers." This statement completely undermines her conclusion that Jane Roe was incapacitated; if she cannot "speculate" as to Jane Roe's BAC, she could not have found that she was incapacitated, except by blindly accepting Jane Roe's statements to the exclusion of all contradicting evidence.

96.     Defendant Wechsler revealed that she consulted with Defendant Babb for how to answer Tate's question.

97.     Defendant Wechsler later stated, after the break in which she consulted with Defendant Babb, that she reconciled her incapacitation conclusion with Jane Roe being sober at 8:00 a.m., because "a sobering event had taken place." This shows again that Defendant Wechsler reasoned backwards from her conclusion that Jane Roe was telling the truth, which denied Doe his right to be presumed not responsible. There is no scientific, medical, or logical basis for "sobering up" more quickly under duress, even if that duress occurred, which it did not.

98.     Defendant Wechsler also revealed that she relied on a witness's testimony that Jane Roe was drunk. That witness was by his own admission very drunk, did not remember going to John Doe's apartment, and was stumbling when trying to walk. Defendant Wechsler called his testimony "compelling."

99.     Defendant Wechsler confirmed that she did not review any literature of the reliability of polygraphs when she determined that polygraphs are not supported by the scientific literature.

100.    In responding to another question, Defendant Wechsler stated that she "could go on and on and on as to my opinions [about the parties] but that may not be fair to [John Doe]," a plain statement of her bias against John Doe.

101.    Following brief closing statements from the parties, the Review Panel hearing concluded at 3:22 p.m.

102.    At 4:13 p.m., the Review Panel finished its deliberations and made its findings. The Panel *unanimously affirmed* Defendant Wechsler's investigation and findings. The Panel found that Defendant Wechsler's investigation was "fair, thorough, and impartial," contrary to all discrediting statements made by Defendant Wechsler during the Review Panel hearing.

103.    Immediately after announcing that the Panel had affirmed Defendant Wechsler's findings, it moved to the sanction phase. After hearing brief statements from the parties, including Jane Roe's request to expel John Doe, it made its decision. The Panel expelled John Doe, six months before he was set to graduate. The Review Panel made its determination on the day after the last day to withdraw from classes, meaning that John Doe could no longer withdraw for the semester without paying tuition. The timing of the Review Panel and its decision meant that John Doe was forced to pay for the entire Fall 2019 semester that he did not attend.

104.    The Review Panel issued its Final Outcome Letter on October 28, 2019.

## The impact on John Doe

105.    Shortly before he was expelled, John Doe was interviewed for an entry level engineer upon graduation at a prestigious firm. He lost that offer as a result of his expulsion.

106.    John Doe transferred to another, much less prestigious university on the other side of the country, where he was required to attend an additional year of classes to graduate. This requirement would have been the same regardless of where he transferred.

107.    As a result of his wrongful expulsion, John Doe suffers severe emotional and psychological harm that will be long lasting. This includes mental trauma and sleeping difficulties. His self-identity has been impacted and he has deliberately withdrawn from seeing most of his hometown friends. He is paranoid and anxious that someone will see him who knows about the situation and tell others, further destroying his reputation. He feels stigmatized by others. The expulsion has negatively affected his standing in the community by damaging his reputation which has caused adjustment difficulties. As a result of the above, he also now suffers from high blood pressure.

108.    Defendants have also caused John Doe severe financial harm. John Doe will face extreme difficulty in any graduate school admissions process and in any job application that asks for his transcript or college disciplinary record. This wrongful expulsion severely impacts his career prospects and will prevent him from earning the level of income he otherwise would have expected based on his hard work and

educational success. Further, this result threatens his liberty to pursue his occupation of choice because he will not be hired anywhere that asks for his college record or a college recommendation.

## CAUSES OF ACTION

### COUNT I:

### Violation of Title IX
### (Against the University of Virginia)

109.   John Doe incorporates the above paragraphs as though set forth fully herein.

110.   John Doe was a student at the University, entitling him to rights under Title IX. 20 U.S.C. §§ 1681 *et seq*.

111.   The University receives federal funding.

112.   The University discriminated against John Doe on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against John Doe as a male student throughout the same.

113.   The University was motivated by pressure from the Department of Education to find male students responsible and expel them, as per the federal government's statements in the Resolution Agreement.

114.   The University exhibited anti-male bias against John Doe by (1) immediately believing the female student's statements and not permitting Doe to meaningfully challenge their testimony via an adversarial hearing; (2) discrediting all witnesses that did not corroborate the female complainant's version of events; (3)

23

refusing to contact the only other eyewitness in the case, Jacob Doe; (4) uniformly crediting Jane Roe's statements, even when self-contradictory, and summarily disbelieving John Doe's statements, testimony, and supporting documents; (5) mischaracterizing Jane Roe's statements to find John Doe responsible; (6) refusing to consider John Doe's polygraph results on the basis of the lack of scientific support, when the investigator reviewed no scientific literature; and (7) issuing and affirming findings that Jane Roe was incapacitated despite significant contradictory evidence. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

115.   The University's decision to discipline John Doe and issue sanctions against him was motivated and caused by its bias against John Doe on the basis of his male sex.

116.   There is no legitimate, nondiscriminatory reason for the University's behavior.

117.   Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

118.   John Doe has suffered severe professional, economic, and psychological harm as a result of this discriminatory process orchestrated against him. Therefore, John Doe requests compensatory damages, declaratory relief in the form of a declaration stating the University unlawfully discriminated against him on the basis of his sex, injunctive relief clearing his disciplinary record at the University, and any other relief the Court deems just and proper.

<u>COUNT II</u>:

**Violation of the Due Process Clause of the Fourteenth Amendment
to the United States Constitution
(Against individual Defendants sued in their individual capacities,
under 42 U.S.C. § 1983)**

119.    John Doe incorporates the above paragraphs as though set forth fully herein.

120.    The University is a state institution established by the Commonwealth of Virginia. The individual Defendants are "persons" operating under "the color of state law" because they were employees or agents of the state government, exercising state power, at all times relevant herein.

121.    The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

122.    Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

123.    John Doe had a property interest in his education as a result of the relationship existing between him and the University, in which he had a reasonable expectation that he would not be treated unlawfully by the University or in violation of its procedures. John Doe's property interest was secured by his payment of tuition and by his abiding by all requirements of enrollment.

124.    John Doe had a liberty interest in his continuing education because (1) he had an interest in pursuing his occupation of choice (as an engineer educated at a

leading university) and (2) Defendants extinguished his right to an education (having paid tuition). Defendants, by their unlawful actions, altered John Doe's legal status as an undergraduate student and caused him to lose a potential job as an engineer. Further, Defendants harmed John Doe's liberty interest in his reputation by their erroneous determination that John Doe committed sexual offenses, which will prevent him from continuing his education elsewhere and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

125.    Defendant Babb, acting on behalf of the University, deprived John Doe of his due process rights to some form of live hearing with some form of cross-examination and denied him his due process right to a meaningful appeal. Defendant Wechsler deprived John Doe of his due process rights by using the modified Single Investigator Model to conduct her investigation, which among other things (1) failed to afford John Doe a meaningful opportunity to be heard; (2) failed to afford him the opportunity to confront his accuser; (3) failed to allow him to conduct any investigation whatsoever; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense. Defendants Leonard, Seneviratne, and Whaley (the Review Panel) compounded these deprivations of due process when they affirmed Defendant Wechsler's findings. Defendant Babb oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

126.   All individual Defendants sued in their official capacity had the authority to rectify the due process deficiencies in this case. All chose not to do so.

127.   These individual Defendants, as agents of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving John Doe adequate procedural safeguards during the adjudication of the charges against him.

128.   This finding will severely limit John Doe's future professional career. John Doe will likely be unable to continue his education into graduate school with this finding on his record and will face severe and irreparable harm to his ability to seek employment requiring a background check or disclosure of his college disciplinary record, absent judicial intervention.

129.   John Doe requests compensatory damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against all individual Defendants sued in their individual capacities.

## COUNT III:

**Violation of the Due Process Clause of the Fourteenth Amendment
to the United States Constitution
(Against James Ryan in his official capacity as President of the University, under
42 U.S.C. § 1983)**

130.   John Doe incorporates the above paragraphs as though set forth fully herein.

131.   The University is a state institution established by the Commonwealth of Virginia. The individual Defendants are "persons" operating under "the color of

27

state law" because they were employees or agents of the state government, exercising state power, at all times relevant herein.

132.   The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

133.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

134.   John Doe had a property interest in his education as a result of the relationship existing between him and the University, in which he had a reasonable expectation that he would not be treated unlawfully by the University or in violation of its procedures. John Doe's property interest was secured by his payment of tuition and by his abiding by all requirements of enrollment.

135.   John Doe had a liberty interest in his reputation and status as a student because (1) he had an interest in pursuing his occupation of choice (as an engineer educated at a leading university) and (2) Defendants extinguished his right to an education (having paid tuition). Defendants, by their unlawful actions, altered John Doe's legal status as an undergraduate student and caused him to lose a potential job as an engineer. Further, Defendants harmed John Doe's liberty interest in his reputation by their erroneous determination that John Doe committed sexual offenses, which will prevent him from continuing his education elsewhere and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

28

136.    Defendant Babb, acting on behalf of the University, deprived John Doe of his due process rights to some form of live hearing with some form of cross-examination and denied him his due process right to a meaningful appeal. Defendant Wechsler deprived John Doe of his due process rights by using the Single Investigator Model to conduct her investigation, which among other things (1) failed to afford John Doe a meaningful opportunity to be heard; (2) failed to afford him the opportunity to confront his accuser; (3) failed to allow him to conduct any investigation whatsoever; and (4) failed to allow him the ability to meaningfully present witnesses or evidence in his defense. Defendants Leonard, Seneviratne, and Whaley (the Review Panel) compounded these deprivations of due process when they affirmed Defendant Wechsler's findings. Defendant Babb oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at the University.

137.    These individual Defendants, as agents of the University and the Commonwealth of Virginia, had no legitimate governmental interest that outweighed giving John Doe adequate procedural safeguards during the adjudication of the charges against him.

138.    This finding will severely limit John Doe's future professional career. John Doe will likely be unable to continue his education into graduate school with this finding on his record and will face severe and irreparable harm to his ability to seek employment requiring a background check or disclosure of his college disciplinary record, absent judicial intervention.

139.    John Doe requests declaratory and injunctive relief against James Ryan in the form of (1) a permanent injunction prohibiting him or any agent of the University from making or maintaining any notation on Doe's professional or educational record relating to the investigation of the Jane Roe's complaint at the University and from taking any further action depriving John Doe of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated John Doe's right to due process and a declaration that the Due Process Clause requires a live hearing with some form of live cross examination in this context.

## COUNT IV

### Breach of Contract
### (Against the University)

140.    John Doe incorporates the above paragraphs as though set forth fully herein.

141.    In accepting the University's offer of admission, John Doe accepted the University's offer to enter into a contractual relationship wherein John Doe would pay tuition and the University would provide an education.

142.    John Doe further agreed to be bound by University policies, and the University agreed to follow its own policies. These terms were express or implied-in-fact because the policies were published by the University and John Doe agreed in writing to abide by them.

143.    The University breached its contract with John Doe when it breached its own policies and procedures in its adjudication of the complaint against John Doe. Specifically, the University breached its contract when it failed to convene an Evaluation Panel, failed to afford Doe a "fair, thorough, and impartial" investigation of the complaint against him, failed to gather "relevant and available evidence" including the testimony of Jacob Doe, and failed to enforce its policy against advisors providing testimony.

144.    As a result of the University's breach, John Doe has suffered substantial financial harm, including having to pay for an additional year of tuition at his transfer school, transportation costs associated therewith, and having to pay for psychological care. Accordingly, John Doe requests injunctive relief including the clearing of his disciplinary record.

## COUNT V

### Tortious Interference with Contractual Relations
### (Against Defendant Wechsler sued in her individual capacity)

145.    John Doe incorporates the above paragraphs as though set forth fully herein.

146.    A valid contract existed between the University and John Doe.

147.    Defendant Wechsler knew that a contract existed between the University and John Doe.

148.    Defendant Wechsler intentionally interfered with this contractual relationship when she, as the agent entrusted with the University's obligation to

provide a "fair, thorough, and impartial investigation" and to "gather relevant and available evidence," failed to do so.

149.    As a result of Defendant Wechsler's tortious interference, John Doe has suffered substantial financial, emotional, and psychological harm.

## COUNT VI

**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution
(Against Defendants sued in their individual capacities,
under 42 U.S.C. § 1983)**

150.    John Doe incorporates the above paragraphs as though set forth fully herein.

151.    The University is a Virginia government entity subject to the United States Constitution.

152.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

153.    Throughout the Title IX process at the University, Doe was treated differently than Roe on the basis of sex.

154.    This differential treatment was a result of discriminatory animus as discussed *supra*, ¶¶112-114.

155.    This discrimination serves no legitimate governmental interest.

156.    If there is a legitimate governmental interest served by sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

157.    Doe requests compensatory and emotional damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against Defendants sued in their individual capacities.

## COUNT VII

**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution
(Against Defendant Ryan sued in his official capacity as President of the University,
under 42 U.S.C. § 1983)**

158.    John Doe incorporates the above paragraphs as though set forth fully herein.

159.    The University is a Virginia government entity subject to the United States Constitution.

160.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

161.    Throughout the Title IX process at the University, Doe was treated differently than Roe on the basis of sex.

162.    This differential treatment was a result of discriminatory animus as discussed *supra*, ¶¶112-114.

163.    This discrimination serves no legitimate governmental interest.

164.    If there is a legitimate governmental interest served by sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

165.    Doe requests declaratory and injunctive relief against Defendant Ryan in the form of (1) a permanent injunction prohibiting him or any agent of the University from making or maintaining any notation on Doe's educational record relating to the investigation of the Roe's complaint at the University and from taking any further action depriving him of his constitutional right to equal protection; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Doe's right to equal protection and a declaration that the Equal Protection Clause bars sex discrimination in public higher education disciplinary proceedings.

### JURY DEMAND

166.    Doe hereby demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE John Doe respectfully requests that this Court grant him the following relief against all Defendants:

1. Damages in the amount to be proved at trial;

2. Costs of suit;

3. Attorneys' fees, pursuant to 42 U.S.C § 1988(b);

4. Injunctive relief in the form of expunging his academic disciplinary record and rescinding a no-trespass order by the University; and

5. Such other and further relief as the Court deems necessary and proper.

Dated:  November 30, 2022                    Respectfully submitted,

                                             _/s/ Benjamin North_____
                                             Benjamin North (VSB No. 97439)
                                             BINNALL LAW GROUP, PLLC
                                             717 King Street, Suite 200
                                             Alexandria, Virginia 22314
                                             Tel:  (703) 888-1943
                                             Fax: (703) 888-1930
                                             ben@binnall.com
                                             *Counsel for Plaintiff John Doe*