UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>         *Plaintiff*,<br>  v.<br><br>UNIVERSITY OF VIRGINIA, *et al.*,<br><br>         *Defendants*. | CASE NO. 3:22-cv-00064<br><br>MEMORANDUM OPINION<br>& ORDER<br><br>JUDGE NORMAN K. MOON |

  Plaintiff John Doe, a former undergraduate student at the University of Virginia, claims that UVA and its employees wrongfully expelled him based on false sexual assault allegations in violation of Title IX of the Education Amendments of 1972 and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. He also alleges breach of contract and tortious interference with contractual relations claims. Defendants move to dismiss his complaint. The Court will grant in part Defendants' motion and will dismiss all of Plaintiff's claims except his Title IX claim against UVA.

**Background**[1]

A. **UVA and Title IX**

  In April 2011, the Department of Education published its "Dear Colleague Letter." Dkt. 16 ¶ 15. Plaintiff alleges that this letter, as well as guiding documents later proffered,

---

[1] The following alleged facts are assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

1

"incentivized universities receiving federal funding, including [UVA], to find male accused students responsible regardless of the weight of the evidence against them." *Id.* ¶ 17. The "Dear Colleague Letter" was rescinded in 2017. *Id.* ¶ 23.

On September 21, 2015, the Department of Education issued a letter, finding that UVA had violated Title IX by not sufficiently addressing complaints of sexual assault and harassment. *Id.* ¶ 21. In that letter, the Department encouraged UVA to expel students accused of sexual assault and stated it would monitor UVA and that if UVA failed to comply with Title IX, it would initiate enforcement proceedings. *Id.*

After a complaint of sexual assault or harassment is reported, UVA contracts an investigator to examine the complaint and issue findings. *Id.* ¶ 56. The investigator's findings are subject to review by a panel, which will affirm the investigator's findings unless it finds they were "not impartial, thorough, or fair." *Id.* UVA also "has a policy or practice of not disciplining students arbitrarily or without cause." *Id.* ¶ 50. The policy's purpose "is to articulate the very reasons why a student might expect to be disciplined." *Id.*

### B. The Alleged Sexual Assault

On or about February 8, 2019, Jacob Doe, a James Madison University student, visited Plaintiff at UVA. *Id.* ¶¶ 25, 27. They went to several student parties on or around UVA's campus. *Id.* ¶ 28. Around 1:40 a.m., Jacob Doe and Plaintiff ran into Jane Roe and two of her friends. *Id.* ¶ 29. They decided to head back to Plaintiff's apartment. *Id.* ¶ 30. After arriving at his apartment, two of Jane Roe's friends fell asleep. *Id.* ¶ 31. Around 2:45 a.m., Jane Roe told Plaintiff and Jacob Doe that she wanted to stay with them at the apartment but wanted her friends to leave. *Id.* ¶ 32. Jacob Doe then woke up Jane Roe's two friends and offered to call them an

Uber, which they accepted. *Id.* ¶ 33. Before they left the apartment, they asked Jane Roe if she wanted a ride home. *Id.* She declined. *Id.*

Around 3:20 a.m., Jacob Doe poured himself, Jane Roe, and Plaintiff a mixed drink. *Id.* ¶ 35. This was the only alcohol consumed by Jane Roe at the apartment. *Id.* At 3:44 a.m., Jane Roe's friend texted her to ask how she was doing, to which Jane Roe responded: "I'm amazing." *Id.* ¶ 36. Soon after, Jane Roe, Jacob Doe, and Plaintiff engaged in allegedly consensual sexual activity. *Id.* ¶ 37.

Around 6:30 a.m., Jane Roe texted a male friend that she had made a "huge mistake." *Id.* ¶ 41. Around 7:50 a.m., Jane Roe texted him again that she was assaulted by Jacob Doe and Plaintiff and that she did not remember what had happened. *Id.* ¶ 42. In these text messages, Jane Roe made several basic spelling mistakes, which according to Plaintiff was allegedly done "to give the false impression that she was heavily intoxicated." *Id.* Plaintiff claims that Jane Roe sent these messages to gain the romantic attention of her male friend. *Id.* ¶ 43.

That morning, Jane Roe went to the hospital for a medical evaluation. *Id.* ¶ 45. The evaluation revealed a "slight [vaginal] tear," which allegedly could have been "caused by consensual or non-consensual sex, as indicated by the nurse." *Id.* The medical report described Jane Roe as "alert, oriented, in no acute physical distress," and the nurse later remarked that Jane Roe "did not seem to be intoxicated at all." *Id.* ¶ 46.

C. **UVA's Investigation of the Alleged Sexual Assault**

On February 10, 2019, Jane Roe submitted a report to UVA, claiming she was sexually assaulted by Jacob Doe and Plaintiff. *Id.* ¶ 47. On February 21, 2019, Plaintiff and Jane Roe were notified by Defendant Emily Babb, UVA's Title IX Coordinator, that UVA had opened an

3

investigation on the sexual assault allegations. *Id.* ¶¶ 5, 49. On the following day, Babb contracted Defendant Christine Wechsler, an attorney, to conduct the investigation. *Id.* ¶¶ 4, 49.

On February 27, 2019, Wechsler interviewed Jane Roe. *Id.* ¶ 60. Jane Roe allegedly made statements during that interview and subsequent interviews, in which she contradicted her prior statements. *Id.* For example, Jane Roe informed the hospital staff "that she was bound, gagged, and blindfolded [during sexual activity with Jacob Doe and Plaintiff], whereas she told Wechsler that she was not bound at all." *Id.* ¶ 61. Jane Roe also told hospital staff that "she was 'tossed' repeatedly" between Plaintiff and Jacob Doe but told Wechsler that Plaintiff "did not 'move' her." *Id.*

Wechsler interviewed five student-witnesses who were "friendly towards Jane Roe" and the nurse who took Jane Roe's statement during the medical evaluation. *Id.* ¶¶ 63, 66. She did not interview Plaintiff's requested witnesses or Jacob Doe. *Id.* ¶ 63. She also reviewed Jane Roe's medical records and text messages sent and received before and after the alleged sexual assault. *Id.* ¶¶ 65, 67. According to Plaintiff, "Wechsler challenged and dismissed evidence that did not conform with Jane Roe's account of events of being violently assaulted." *Id.* ¶ 68.

On or about June 7, 2019, Wechsler sent a draft report to Plaintiff and Jane Roe. *Id.* ¶ 69. Both parties submitted responses to the report, and both responded to each other's responses. *Id.* ¶¶ 70–71. For her responses, Jane Roe submitted attorney drafted responses, purportedly in violation of UVA's policy. *Id.*

Plaintiff submitted two sets of polygraph examination results. *Id.* ¶ 72. The results showed that Jacob Doe and Plaintiff "were 'not deceptive' when they answered in the negative to three questions: '(1) did you engage in any non-consensual sexual activity with [Jane Roe]?; (2) did you have any sexual contact with [Jane Roe] when you believed that she was incapacitated?;

4

and (3) did [Jane Roe] give you any verbal or physical indication she did not want to have sexual contact with you?'" *Id.* While Plaintiff offered to pay for Jane Roe's polygraph examination, she refused to undergo one. *Id.* ¶ 73.

On August 30, 2019, Wechsler published her final report. *Id.* ¶ 74. She found that Plaintiff was responsible for the sexual assault and harassment. *Id.* ¶ 75. Specifically, she found no evidence in the record that Jane Roe consented to giving Plaintiff oral sex; and she further found that Jane Roe was incapacitated due to alcohol intoxication and incapable of giving consent. *Id.* ¶¶ 75–76. She also dismissed Plaintiff's polygraph evidence because "the polygraph questions lack[ed] specificity or definitions [to] align with the Title IX Policy definitions." *Id.* ¶ 75. After the report was released, Plaintiff submitted a statement challenging the final report's findings and specifically highlighting the contradictions in Jane Roe's statements. *Id.* ¶ 77.

### D. UVA's Review Panel

Pursuant to its Title IX policy, UVA convened a review panel. *Id.* ¶ 78. Babb hired an outside attorney, Christopher Tate, to facilitate and chair the review panel. *Id.* Three UVA employees, Defendants Rebecca Locke Leonard, Rajiva Seneviratne, and Diane Whaley, were chosen for the review panel. *Id.* ¶¶ 6–8, 79.

On October 23, 2019, the review panel held a hearing. *Id.* ¶ 80. At the start of the hearing, Tate informed "the parties and the voting members of the [review panel] that [] Wechsler has the discretion to determine the relevancy of all of the evidence in the case and that if something is redacted or not included in the Final Report, the [review panel] is not to consider it." *Id.* ¶ 82. He also told the parties that the review panel's process was to be consistent with due process of law and noted that the parties' attorneys could not speak during the hearing unless they were advising

5

clients privately. *Id.* ¶ 83. While neither party was allowed to directly question the other party, each party was permitted to submit questions to Tate, who would determine whether the question was relevant. *Id.* ¶ 84.

Following brief opening statements, the review panel asked Plaintiff questions, which contradicted an agenda provided beforehand that indicated Jane Roe would answer questions first. *Id.* ¶ 86. Plaintiff objected to this, and Tate told him that the panel would proceed with questioning him first. *Id.* Plaintiff answered all questions posed by the panel while Jane Roe did not answer all questions posed to her. *Id.* ¶ 87.

During the review panel hearing, Wechsler shared that she had conducted around thirty Title IX investigations at UVA, had helped implement the "Dear Colleague Letter" in Pennsylvania, and had been "involved in women's issues and 'victim services' during her work in Pennsylvania's government." *Id.* ¶ 88. The review panel asked her how she resolved the discrepancy between Jane Roe's statement at the hospital "that Jacob Doe put his hand over her mouth and Jane Roe's statement to Wechsler that she put her own hand over her mouth." *Id.* ¶ 89. She replied that she gave more weight to Jane Roe's statement to her because it was "her self-report." *Id.*

Wechsler also stated that "Jane Roe only had one drink between 2:30 a.m. and 8:00 a.m." *Id.* ¶ 93. In total, she "found that Jane Roe had two to three shots at the beginning of the night, one half of a light beer can a couple hours later, then a mixed drink, and then a tequila sunrise shortly thereafter, and finally the single mixed drink at [Plaintiff's] apartment." *Id.* Plaintiff alleges that this "six-and-a-half drinks over the course of six to ten hours" would be "unlikely to result in incapacitation for a healthy, non-medicated person of [Jane Roe's] height and weight." *Id.* Wechsler testified that there was no evidence of Jane Roe being drugged. *Id.* ¶ 94.

6

Tate asked Wechsler how she concluded Jane Roe was incapacitated, to which Wechsler responded that she lacked the expertise to speculate about Jane Roe's Blood Alcohol Content. *Id.* ¶ 95. She then asked for a break to consult Babb. *Id.* ¶¶ 95–96. Following the break, Wechsler "reconciled her incapacitation conclusion with Jane Roe being sober at 8:00 a.m., because 'a sobering event had taken place.'" *Id.* ¶ 97. She also provided that she relied on a witness's testimony who said Jane Roe was drunk. *Id.* ¶ 98. However, this witness was purportedly also drunk on the night of the alleged sexual assault and did not remember going to Plaintiff's apartment. *Id.*

During her testimony, Wechsler stated that she did not review any literature on the reliability of polygraphs when she found that polygraphs were not supported by scientific literature. *Id.* ¶ 99. She also stated that she "could go on and on and on as to [her] opinions [about the parties] but that may not be fair to [Plaintiff]." *Id.* ¶ 100.

At 3:22 p.m., the hearing concluded after the parties presented their closing statements. At 4:13 p.m., the review panel unanimously affirmed Wechsler's investigation and findings as "fair, thorough, and impartial." *Id.* ¶ 102. Immediately after announcing its decision, the review panel proceeded to the sanction phase with each party presenting brief statements on the appropriate sanction. *Id.* ¶ 103. The review panel decided to expel Plaintiff. *Id.* At the time of his expulsion, Plaintiff had six months before his graduation, and because he could no longer withdraw from fall semester classes, he was forced to pay tuition for the fall 2019 semester. *Id.*

Following expulsion, Plaintiff transferred to another university where he graduated. *Id.* ¶ 106. Because of his expulsion, he suffers from severe emotional and psychological harm and high blood pressure. *Id.* ¶ 107. His expulsion has damaged his reputation in the community, caused him financial harm, and diminished his career prospects. *Id.* ¶¶ 107–08.

Plaintiff brings seven counts in his First Amended Complaint: a Title IX claim against UVA; § 1983 claims for due process and equal protection violations under the U.S. Constitution against Wechsler, Babb, Leonard, Seneviratne, and Whaley in their individual capacities and against James Ryan in his official capacity as UVA's President; a breach of contract claim against UVA; and a tortious interference with contractual relations claim against Wechsler in her individual capacity. *Id.* at 23–34. He seeks compensatory damages, costs, attorney's fees, expungement of his disciplinary record, and recission of a no trespass order for UVA's grounds. *Id.* at 34.

## **Legal Standard**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in a plaintiff's favor, *Rubenstein*, 825 F.3d at 212. A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotation marks omitted). This is not

to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

## Discussion

### A. Alleged Title IX Violation against UVA

UVA first moves to dismiss Plaintiff's Title IX claim, arguing that he has failed to sufficiently allege discrimination and causation to state a claim for relief. Dkt. 19 at 6–7.[2]

Title IX prohibits federally funded educational institutions from discriminating on the basis of sex, and its protections extend to sex discrimination in higher-education disciplinary hearings. 20 U.S.C. § 1681(a); *Sheppard v. Visitors of Va. State Univ.*, 993 F. 3d 230, 235–37

---

[2] Defendants attach approximately 91 pages of exhibits to their motion to dismiss. *See* Dkts. 19-1 (The Office of Civil Rights' ("OCR") 2015 Letter of Findings), 19-2 (UVA's Resolution Agreement with OCR), 19-3 (UVA's Policy on Sexual & Gender-Based Harassment & Other Forms of Interpersonal Violence), 19-4 (Final Investigation Report on Plaintiff's Alleged Sexual Assault and Harassment), 19-5 (Final Outcome Letter regarding Plaintiff). Generally, at the motion to dismiss stage, a court should focus on the sufficiency of the facts alleged by the plaintiff in the complaint. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). "Consideration of extrinsic documents by a court during the pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment." *Id.* However, a court may consider a document attached to a motion to dismiss when it is "integral to and explicitly relied on in the complaint" and authenticity is not disputed. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). "A document is integral to a complaint where its very existence, and not the mere information it contains, gives rise to the legal rights asserted or where the legal rights at issue in the complaint rely heavily upon its terms and effect." *Moler v. Univ. of Md. Med. Sys.*, No. 1:21-cv-01824, 2022 WL 2716861, at *2 (D. Md. July 13, 2022) (internal quotation marks omitted). For this motion to dismiss, the Court will not consider Defendants' exhibits. The attached exhibits are not integral to Plaintiff's Title IX claim because he relies on the accumulation of UVA's alleged actions during the Title IX investigation to show bias against the backdrop of federal government pressure on UVA. Additionally, the Court is concerned about considering approximately 91 pages of exhibits when the parties have not been afforded an opportunity to conduct reasonable discovery.

(4th Cir. 2021). To state a plausible claim for relief under Title IX, Plaintiff must allege facts that, if true, would "raise a plausible inference that the university discriminated against [the student] on the basis of sex." *Sheppard*, 993 F. 3d at 235. The Fourth Circuit has explained that a Title IX plaintiff must establish a "causal link between the student's sex and the university's challenged disciplinary proceeding" to prevail on a Title IX claim, and that the statute requires a showing of "but-for" causation. *Id.* at 236. In other words, Plaintiff must show that sex was the "but-for" cause of the university's challenged disciplinary action. *Id.*

Evidence of "clear procedural irregularities" can support a plausible inference of sex discrimination. *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020); *see Doe v. Va. Polytechnic Inst.*, No. 7:19-cv-00249, 2022 WL 3334501, at *9 (W.D. Va. Aug. 11, 2022). "[I]f procedural irregularities are sufficiently numerous, lopsided, and/or important, they can sometimes support an inference of sex discrimination." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 793 (7th Cir. 2022).

Plaintiff has sufficiently alleged evidence of procedural irregularities to support an inference of sex discrimination. In his Amended Complaint, Plaintiff alleges that UVA discriminated against him on the basis of sex by "granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against [Plaintiff] as a male student throughout the same." Dkt. 16 ¶ 112. He specifically alleges that UVA, through its investigator and review panel, acted with an anti-male bias by: (1) not interviewing his selected witnesses or Jacob Doe, the other party accused of sexual assault by Jane Roe; (2) refusing to consider his polygraph results without reviewing the scientific literature on polygraphs; and (3) not permitting Plaintiff to meaningfully challenge testimony during the review panel hearing. *Id.* ¶ 114. He also alleges that the investigator during the review panel

10

hearing stated that she "could go on and on and on as to [her] opinions [about the parties] but that may not be fair to [Plaintiff]." *Id.* ¶ 100. In addition, he challenges the sufficiency of the evidence used to find him guilty of sexual assault and harassment. For instance, he alleges that Jane Roe, his accuser, made inconsistent statements during the investigation that were ignored by the investigator and that the investigator affirmed "findings that Jane Roe was incapacitated despite significant contradictory evidence." *See id.* ¶¶ 60, 77, 88–89, 114. Plaintiff also claims his investigation and disciplinary hearing occurred when UVA was under pressure from the Department of Education's letter to UVA, which found that UVA had violated Title IX by not sufficiently addressing complaints of sexual assault and harassment. Dkt. 32 at 22–23; Dkt. 16 ¶¶ 17, 21; *see generally Doe v. Univ. of Ark.–Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) (finding a plaintiff's allegations sufficient to state a plausible Title IX claim when a plaintiff received "a dubious decision" against the backdrop of substantial pressure on the university from investigations into whether it failed to properly investigate and adjudicate Title IX complaints by females against males).

Taking all of Plaintiff's allegations as true, as the Court must at this stage of the litigation, the Court finds that the accumulation of his allegations regarding procedural irregularities and insufficient evidence against the backdrop of pressures on UVA raises a plausible inference that UVA discriminated against him on the basis of sex during its investigation and disciplinary hearing under Title IX.

### B. Alleged Procedural Due Process Violation

To state a procedural due process claim, Plaintiff must show (1) he had a constitutionally cognizable life, liberty, or property interest, (2) that was deprived by state action, (3) without due

process. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). Defendants argue that Plaintiff fails to show that he had a protected Fourteenth Amendment property or liberty interest in his continued enrollment or reputation. Dkt. 19 at 21–20. The Court agrees.

### a. Liberty Interest

In his Amended Complaint, Plaintiff asserts that he had a liberty interest in continuing his education and that Defendants harmed his "liberty interest in his reputation by their erroneous determination that [he] committed sexual offenses," which will further harm him if he applies to jobs that require background checks or character and fitness evaluations. Dkt. 16 ¶ 124.

To allege "a liberty interest based on damage to one's good name, reputation, or integrity, a person must show more than a reputational injury to make out a constitutional claim." *Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:21-cv-00378, 2022 WL 3006391, at *9 (W.D. Va. July 28, 2022) (citing *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314–15 (4th Cir. 2012)). "[A] plaintiff must demonstrate that his reputational injury was accompanied by a state action that distinctly altered or extinguished his legal status if he wants to succeed." *Shirvinski*, 673 F.3d at 315 (internal quotation marks omitted). This is often referred to as the "stigma plus" test. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 n.16 (4th Cir. 2006). For example, in the context of public employment, the Fourth Circuit has recognized that "a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest." *Shirvinski*, 673 F.3d at 315.

Here, Plaintiff is not alleging that he lost employment with UVA along with damage to his good name, nor has Virginia established a legal right for any person to attend public university. *See Shirvinski*, 673 F.3d at 315; *Va. Polytechnic Inst. & State Univ.*, 2022 WL

3006391, at *9.³ Thus, he fails to allege that his reputational injury was accompanied by an alteration or extinction of his legal status, and therefore, he has not stated sufficient facts to support that he had a liberty interest in his good name, reputation, or integrity.

### b. Property Interest

Plaintiff also asserts that he had a property interest in continuing his university education. Dkt. 32 at 36. "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source." *Sheppard*, 993 F.3d at 239 (internal quotation marks and citation omitted). To sufficiently allege a protected property interest, Plaintiff must have "more than an abstract need or desire for it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Indeed, Plaintiff must have a legitimate claim of entitlement to the property interest. *Id.*

In determining whether a property interest exists, the Court must consider "'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Roth,* 408 U.S. at 577). It is undisputed that Virginia has not created a property interest in continued university education. *See Va. Polytechnic Inst. & State Univ.*, 2022 WL 3006391, at *7; s*ee also Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005), *aff'd*, 193 F. App'x 248 (4th Cir. 2006).

---

³ Other district courts in the Fourth Circuit have similarly found that a university student in Virginia does not have a protected liberty reputational interest during disciplinary hearings regarding his or her alleged sexual misconduct. *See Doe v. Alger*, 175 F. Supp. 3d 646, 661 (W.D. Va. 2016); *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 499 (W.D. Va. 2019); *Va. Polytechnic Inst. & State Univ.*, 2022 WL 3006391, at *10; *see also Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-00249, 2020 WL 1309461, at *5 (W.D. Va. Mar. 19, 2020) (noting the "court has previously held that a public university student does not have a protected liberty interest in his continuing education").

Despite this lack of state law authority, Plaintiff asserts that his property interest stems from a UVA policy in which "he had a reasonable expectation that he would not be treated unlawfully by [UVA] or in violation of its procedures." *Id.* ¶ 123; *see* Dkt. 32 at 36. However, he cannot sufficiently allege a property interest that stems from a school policy because the Fourth Circuit has "held that mere violations of school procedures are insufficient by themselves to implicate the interests that trigger a federal due process claim." *Sheppard*, 993 F.3d at 239 (quoting *Kowalski v. Berkeley Cnty. Schools*, 652 F.3d 565, 576 (4th Cir. 2011)) (cleaned up).

Accordingly, Plaintiff fails to allege facts to show he had a constitutionally cognizable life, liberty, or property interest. The Court will thus dismiss his due process claims against Defendants in their individual and official capacities.

### C. Alleged Equal Protection Violation

To state an equal protection claim, Plaintiff must plead sufficient facts to demonstrate that he was plausibly "treated differently from others *who were similarly situated* and that the unequal treatment was the result of discriminatory animus." *Sheppard*, 993 F.3d at 238 (internal quotation marks omitted) (emphasis added). Plaintiff alleges that throughout the Title IX process he was treated differently than Jane Roe, his accuser, on the basis of his sex, in violation of the Equal Protection Clause. Dkt. 16 at 32–34. He specifically argues that he was similarly situated to Jane Roe because they were both UVA students "entitled to the same procedural protections embedded in the Title IX process at the University." Dkt. 32 at 47.[4]

However, Plaintiff cites no case law to support his argument that an accuser and an

---

[4] Plaintiff's equal protection claims rests on his theory that he was similarly situated to Jane Roe. Dkt. 16 ¶ 153. He does not offer another theory for how he was treated differently from others who were similarly situated.

14

accused are similarly situated for purposes of an equal protection claim, and other courts have rejected such an argument. *See e.g.*, *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 580 (8th Cir. 2021) ("[I]t goes almost without saying that a sexual assault complainant and those she accuses of sexual assault are not similarly situated as complainants.") (internal quotation marks omitted); *Armstrong v. James Madison Univ.*, No. 5:16-cv-00053, 2017 WL 2390234, at *12 (W.D. Va. Feb. 23, 2017), *report and recommendation adopted*, No. 5:16-cv-53, 2017 WL 2399338 (W.D. Va. June 1, 2017) (dismissing the plaintiff's equal protection claims on the ground that the plaintiff was not similarly situated to his sexual misconduct accusers).

The Court agrees with these cases and finds that Plaintiff, the accused, was not similarly situated to Jane Roe, the accuser. Thus, the equal protection claims will be dismissed because Plaintiff has not sufficiently identified anyone "similarly situated" to him. *See Sheppard*, 993 F.3d at 238 (finding a plaintiff's equal protection claim fails to survive a motion to dismiss because he failed to plausibly demonstrate that he was similarly situated to another student).[5]

### D. Alleged Breach of Contract Claim

To state a breach of contract claim in Virginia, Plaintiff must show (1) a legally enforceable obligation of UVA to Plaintiff; (2) UVA's violation or breach of that obligation; and (3) injury or damage caused to Plaintiff from the breach. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). Plaintiff alleges that he accepted UVA's admission offer by agreeing to pay tuition, and in exchange, UVA would provide him an education. Dkt. 16 ¶ 141. He further claims that he and UVA agreed to be bound by UVA's policies and that UVA breached its "policies and procedures in its adjudication of the complaint against" Plaintiff. *Id.* ¶ 142–43.

---

[5] In addition, Plaintiff conceded that Defendants sued in their individual capacities are entitled to qualified immunity on the equal protection claim. Dkt. 32 at 48 n.12.

District courts in the Fourth Circuit have declined to recognize tuition as a basis for an implied contract between a student and a university under Virginia law. *See Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 588 (E.D. Va. 2018); *Doe v. Wash. & Lee Univ.*, 439 F. Supp. 3d 784, 795–76 (W.D. Va. 2020); *see also Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:19-cv-00249, 2020 WL 1309461, at *6 (W.D. Va. Mar. 19, 2020).

Despite this authority, Plaintiff cites a 1976 case in which a district court in the Western District of Virginia noted that "students enrolled in state supported institutions acquire a contractual right for the period of enrollment to attend, subject to compliance with scholastic and behavioral rules of the institution, and to dismissal for violation thereof." *Krasnow v. Va. Polytechnic Inst. & State Univ.*, 414 F. Supp. 55, 56 (W.D. Va. 1976), *aff'd sub nom.*, 551 F.2d 591 (4th Cir. 1977). However, the court in *Krasnow* considered a deprivation of substantive constitutional rights claim, not a Virginia contract claim. *See id.* In addition, Plaintiff cites no case in which a Virginia court has recognized a contractual relationship under his theories. Thus, to accept his "argument [based on *Krasnow*] would impermissibly expand Virginia law without any input from Virginia's highest court." *Marymount Univ.*, 297 F. Supp. 3d at 588.

Plaintiff also contends that his breach of contract claim should survive because it rests on the combination of his tuition payment and agreement to be bound by UVA's policies. Dkt. 32 at 49–50. This argument, however, is unpersuasive. Under Virginia law, university student conduct policies are "not binding, enforceable contracts." *Marymount Univ.*, 297 F. Supp. 3d at 587; *Wash. & Lee Univ.*, 439 F. Supp. 3d at 792 ("[T]his Court and numerous others have held that generally applicable university conduct policies, such as handbooks and sexual assault policies, do not establish a contract under Virginia law"); *see also Brown v. Rectors & Visitors of Univ. of Va.*, 361 F. App'x 531, 534 (4th Cir. 2010). Virginia law requires an "absolute mutuality of

16

engagement between the parties such that each party is bound and may hold the other party to the agreement." *Wash. & Lee Univ.*, 439 F. Supp. 3d at 792. This mutuality between Plaintiff and UVA is lacking in UVA's policies because such policies can be unilaterally revised by UVA. *See id.* For these reasons, the Court will dismiss Plaintiff's breach of contract claim for failure to state a claim for relief.

### E. Alleged Tortious Interference with Contractual Relations

To state a tortious interference with contractual relations claim, Plaintiff must show

> '(1) the existence of a valid contractual relationship . . .; (2) knowledge of the relationship . . . on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship . . . ; and (4) resultant damage to the party whose relationship . . . has been disrupted.'

*Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 210 (4th Cir. 2001) (quoting *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). As discussed above, Plaintiff fails to allege a valid contractual relationship between himself and UVA, and as such, this claim will be dismissed for failure to state a claim for relief.

### Conclusion

For the above reasons, the Court **GRANTS in part** Defendants' motion to dismiss, Dkt. 18, and dismisses all of Plaintiff's claims except his Title IX claim against UVA. Defendants Wechsler, Babb, Leonard, Seneviratne, Whaley, and Ryan are hereby **DISMISSSED** from the case.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion and Order to all counsel of record.

Entered this 10th day of April, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

18